David **PEEK**, Petitioner-Appellant,

v.

Ralph **KEMP**, Warden, Georgia Diagnostic and Classification Center, Respondent-Appellee.

No. 82–8713.

United States Court of Appeals, Eleventh Circuit.

Oct. 26, 1984.

Opinion on Granting Rehearing Feb. 5, 1985.

Vance, Circuit Judge, filed separate opinion concurring in part and dissenting in part.

George H. Kendall, III, Russell F. Canan, Atlanta, Ga., for petitioner-appellant.

Mary B. Westmoreland, Nicholas G. Dumich, William B. Hill, Jr., Asst. Attys. Gen., Atlanta, Ga., for respondent-appellee.

Before VANCE and CLARK, Circuit Judges, and SWYGERT*, Senior Circuit Judge.

CLARK, Circuit Judge:

On July 28, 1976, David Peek was tried on two counts of murder and one count of kidnapping in a superior court in Greene County, Georgia. The jury reached a verdict of guilty on all counts at 12:45 a.m. the following day. The penalty phase com-

* Honorable Luther M. Swygert, U.S. Circuit Judge for the Seventh Circuit, sitting by designa-    tion.

menced immediately upon return of the verdict, and Peek was sentenced to die. His convictions and death sentences with respect to the murders were affirmed on direct appeal,[1] and relief was denied in state habeas proceedings, and again by the district court from the Middle District of Georgia on a petition for habeas corpus under 28 U.S.C. § 2254.

The defendant's primary claim in this appeal is that the district court was mistaken in holding that no constitutional error occurred when the Greene County trial court excused and replaced a regular juror, Chester Greeson, with an alternate juror, Ben Weinstein, in the final moments of jury deliberations. Affirming Peek's murder conviction would require that we hold constitutional a trial procedure in which 1) the lone juror to reserve a reasonable doubt as to the defendant's guilt is excused because he became nervous and upset; 2) the juror is excused without first being interrogated by the trial court, notwithstanding that the juror was available for that purpose; 3) the decision to excuse the juror is assented to by defendant's counsel outside defendant's presence and without consultation with the defendant; and 4) the juror is replaced by an alternate juror without any supplemental instruction whatsoever to the alternate or the other jurors, moments after which a guilty verdict is returned. This we cannot do.

For a fuller understanding of the circumstances in which juror Greeson was excused, we begin by reproducing here the entire proceeding as shown on the record beginning at 10:27 p.m., when the jury retired to consider its verdict.

THE JURY IS OUT OF THE COURTROOM AT 10:27 P.M.

THE COURT: Mr. Briley, any exceptions to the Charge on behalf of the State?

MR. BRILEY: None, Your Honor.

THE COURT: Any exceptions to the Charge on behalf of the Defendant?

MR. ASHLEY: None, Your Honor.

THE COURT: All right. If you all will get the indictment and all of the evidence and send it out to the Jury.

COURT IS IN RECESS AWAITING THE JURY'S VERDICT.

THE JURY IS BACK AT 12:00 MIDNIGHT.

THE COURT: Mr. Foreman, has the Jury reached a verdict?

MR. FOREMAN: No, sir.

THE COURT: All right, sir.

MR. FOREMAN: Not at the present time.

THE COURT: All right, sir. Let me make this inquiry, Ladies and Gentlemen, of course, as I said this afternoon, I don't want any of you to feel like we are trying to put anybody between the rock and the hard spot or just pressure you into doing anything. We have the rooms reserved and we can very easily accomodate [sic] you now, to send for whatever you need to stay overnight if you feel it's going to be a problem, because, of course, as I indicated in my previous charge, this is only the first phase and depending on your findings in this, there may be a second phase. So, I'm just trying to inquire of you as to whether or not you would like to go ahead and go to bed and get some rest and start back in the morning?

MR. FOREMAN: I think that if we could have a few more minutes? Maybe fifteen?

THE COURT: All right, sir. As I said, of course, there is another phase to it, depending on what the finding is in the first and as I said, I want to again make it clear to you that I am not trying to pressure anybody or any or all of you. But if you say, give you a few more minutes, let's do that and see what can come of it. We haven't been out that long, but it's getting late now and I know for a lot of you, it's later than usually you stay up.

**1.** On appeal, the Georgia Supreme Court reversed his death sentence on the kidnapping conviction. *Peek v. State,* 239 Ga. 422, 238 S.E.2d 12 (1977).

THE JURY IS OUT OF THE COURTROOM FOR DELIBERATIONS AT 12:03 A.M.

THE COURT: Mr. Briley, are there any exceptions to the Supplemental Charge?

MR. BRILEY: None, Your Honor.

THE COURT: I don't guess we can call it a Re-Charge. Mr. Ashley, any objections to the Supplemental Charge?

MR. ASHLEY: None as I know of, Judge.

THE COURT: Thank you, let the Court be at ease.

COURT IS IN RECESS AWAITING THE JURY'S VERDICT.

THE FOREMAN OF THE JURY ASKS THE COURT A QUESTION AT 12:35 A.M.

THE COURT: All right. Let the record show that the Foreman has come out and indicated that Mr. Chester Geesling [sic], he feels, is definitely extremely nervous and almost at the breaking point and that they have been trying to do what they could to placate him and keep something from happening and that Mr. Geesling [sic] has requested that he would like to be excused and Mr. Briley, I believe, you said that you will stipulate—

MR. BRILEY: The State will stipulate that he may be excused.

MR. ASHLEY: Under the circumstances, the Defense will stipulate that he may be excused.

THE COURT: All right, sir.

MR. BRILEY: Let's substitute the first alternate, is that—

THE COURT: Well, I think we ought to have the Foreman to advise the, after Mr. Geesling [sic] leaves, to advise the panel that we are not going to just, you know, start excusing at random, because, but I think they are all aware as I understand it from what you say of the situation—

MR. FOREMAN: Everybody else is just fine, but I mean, it is just that that fellow.

THE COURT: Yes, sir. Okay. Well, we'll then, let him go. Let him come on out then.

MR. FOREMAN: You just want me to tell him he can leave?

THE COURT: Yes, sir.

MR. FOREMAN: Because he doesn't want to make a big to do about it.

THE COURT: Right. Well, I haven't got a backdoor for him to go out. Mr. Weinstein?

MR. WEINSTEIN: Yes, sir.

MR. FOREMAN: Can I just tell him the gist of what we've been talking about?

THE COURT: All right. We have just excused a Juror by agreement of both Counsel and by the Court on word that has come out of the Jury Room here, so, we need to ask you to go in and take his place, please, sir.

MR. WEINSTEIN: All right, sir.

MR. WEINSTEIN, THE ALTERNATE GOES INTO THE JURY ROOM FOR DELIBERATIONS AT 12:42 A.M.

THE JURY IS BACK AT 12:45 A.M.

THE COURT: Mr. Foreman, has the Jury reached its verdicts?

MR. FOREMAN: Yes, sir, we have.

State's Exhibit No. 2, Vol. II at pp. 230–33.

The facts surrounding juror Greeson's dismissal and replacement, dimmed by a two-year interval, were amplified at a state habeas hearing. The Superior Court of Butts County, Georgia, the court which entertained the state habeas petition, did not make specific findings of fact and conclusions of law with respect to this primary question; rather its determination is in general terms and narrative in form.[2] The court found that after the jury had deliberated on its verdict for three hours, the foreman "emerged from the jury room and told the judge that one of the jurors was sick," that after the trial judge announced that Greeson was unable to continue as a juror, "the first alternate was sent to the jury room and a guilty verdict was re-

---

**2.** The state habeas court's order respecting the dismissal of juror Greeson is reproduced in Appendix A of this opinion.

turned a few minutes later"; and that the trial judge did not err "when it had been made to appear to the court a juror was ill and unable to continue." The court then stated that although Greeson had a reasonable doubt concerning Peek's guilt, "he was not asserting that doubt in the form of a certain vote [2a] in the jury room but was, because of his physical and emotional condition not participating in the deliberations at all." The habeas court concluded: "[T]he replacement of juror Greeson with the first alternate Weinstein was done for good cause. The procedure followed complied with applicable Georgia statutes and did not violate any federal constitutional rights of Petitioner." The court went on to state that "alternate Weinstein testified that he went over the evidence with the other jurors," and concluded that the amount of time the jury deliberated with alternate Weinstein before returning the guilty verdict was of "no legal significance." No decisional law was cited in support of the court's conclusions.

## II

At the threshold of reaching a decision, we face the conformance with the provision of 28 U.S.C. § 2254. *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981) (*Mata I*), and *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (*Mata II*). In *Mata II*, the Supreme Court characterized the holding in its prior decision as follows:

We held that 28 U.S.C. § 2254(d) requires federal courts in habeas proceedings to accord a presumption of correctness to the state court findings.... We held that if a federal court concludes that a presumption of correctness does not control, it must provide a written explanation of the reasoning that led it to conclude that one or more of the seven factors listed in § 2254 were present or the reasoning which led it to conclude that the state finding was "not fairly sup-

ported by the record." 449 U.S. at 551 [101 S.Ct. at 771].

455 U.S. at 593, 102 S.Ct. at 1304.

■ In the instant case, the state habeas court, after an evidentiary hearing, made purported findings with respect to the replacement of juror Greeson by alternate juror Weinstein. Because none of the first seven factors listed in § 2254(d) is present, *Mata II* directs us to defer to those findings unless they are not fairly supported by the record. Upon a close examination of the historical facts occurring during the trial as shown by both the trial record and the habeas hearing, we are unable to say that all the state habeas "findings" find support in the record, and therefore we need not give them the presumption of correctness to which they would otherwise be entitled. (The magistrate to whom the district court referred the federal habeas claim based his recommended findings and conclusions, which were adopted by the district court, upon the state court record and the evidence submitted to the state habeas court. He conducted no additional evidentiary hearing. His findings parallel the state court's findings. We conclude, therefore, that the magistrate's findings, though entitled to our respect and consideration, have no binding effect per se upon our decision.)

The trial record and the supplementation evidence submitted to the habeas court depict a story significantly different from the impressions gained from the state habeas court's factual commentary. To bring that story into full focus, we refer to the evidence submitted to the habeas court.

Juror Greeson testified that deliberations had been under way for what seemed to be three or four hours, when he began to get "sick." [3] He indicated that his sickness was due not to physical illness, but rather to the "pressure of the decision." (H.C. I Tr. 21). Greeson further recalled that be-

---

**2a.** This finding of fact is contrary to habeas corpus testimony of jury foreman Smith. See Appendix C, p. 689.

**3.** Greeson's testimony at the state habeas proceedings is reproduced in relevant part in Appendix B of this opinion.

tween thirty and forty minutes prior to his removal, the jury had shifted to eleven to one in favor of guilt, he being the one holdout. (H.C. I Tr. 22–24). Greeson testified that he remembered in particular the portion of the trial court's instruction charging members of the jury to acquit the defendant if they harbored a reasonable doubt as to the defendant's guilt; Greeson further testified that he had such a doubt with respect to the guilt of Peek.

Greeson recalled that as time passed with the jury deadlocked at eleven to one, his nervousness and upset condition intensified and it began to seem as if he could not make a decision. The foreperson discussed the problem with him and the two agreed it would be best if Greeson were excused. Greeson recollected that the foreperson then left the jury room to talk over the matter with the judge, and shortly thereafter returned and notified Greeson that he had been dismissed. Prior to his dismissal, he did not speak with the trial court, nor was he voir dired by any party. He further recalled that as he left to go home, he encountered the trial judge and the judge asked him if he needed to go to the hospital. Greeson responded, "No. I believe I'll be all right in a little bit," and drove himself home. He also testified that once outside, he began to feel better. (H.C. I Tr. 20–21).

Lawrence Smith, the jury foreman, testified after Greeson.[4] He recalled that at midnight, when he requested an additional fifteen minutes for deliberation, "a division" existed in the jury and that he had no recollection as to whether Greeson was ill at the time. (H.C. I Tr. 38–39). He also testified that around midnight, Greeson's complexion reddened and he began to perspire and make frequent trips to the rest room. Smith stated that Greeson became "uncooperative" and that Greeson's conduct was not "my idea of jury deliberation." (H.C. I Tr. 52–53). Smith also indicated that everyone had agreed to a verdict but Greeson, and that Greeson ceased to participate in deliberations, although he continued to cast his vote in favor of acquittal. The foreperson also testified that he spoke to Greeson, and that it was the consensus of the jury that he be excused. While Smith first remembered testifying that he then told the trial court that Greeson was sick, he corrected himself and stated that he probably told the court that Greeson was extremely nervous. (H.C. I Tr. 44). He further indicated that the possibility of postponing deliberations until morning was never discussed. Finally, Smith recalled that after alternate Weinstein entered the jury room, a verdict was reached in a "short time," in fifteen or twenty minutes.

The defendant's trial counsel, W. Seaborne Ashley, Jr., testified. He indicated the trial judge summoned him and the district attorney over to the side of the bench where the judge and the foreman were talking. Counsel recalled the foreman stating that one of the jurors had withdrawn and become pale. The county sheriff, a fifth party to the conversation, then left to confirm whether Greeson had any past medical problems. (H.C. I Tr. 93). When the sheriff returned shortly thereafter, he said that Greeson had a history of having a mild form of epilepsy.[5] The court asked both the district attorney and counsel whether Greeson should be excused. Counsel testified that he did not oppose the excusal because he understood that the jury was split nine to three. (H.C. I Tr. 93). He further testified that, had he known that the jury was split eleven to

---

4. Smith's testimony at the state habeas proceedings is reproduced in relevant part in Appendix C of this opinion.

5. This testimony is completely discounted by the fact that no one knew which juror was being excused. The panel had jurors Geesling and Greeson. Both were subpoenaed to the state habeas hearing to ensure the excused juror

could be interrogated. It is apparent that the trial judge thought the juror was named Geesling (*see* text *supra*, page 675). There is no reason to think others were not mistaken. At the habeas hearing, Greeson testified he had no physical ailments at the time of the trial but since that time had been diagnosed as having mild hypertension.

one, he would not have concurred in Greeson's discharge. He also remarked that he did not confer with petitioner prior to informing the court that he had no objection to the excusal of Greeson.[6]

Weinstein testified that he had been the first alternate, and had been in the courthouse from 9:00 a.m. until he was placed on the jury at 3:00 a.m., the following morning.[7] (H.C. I Tr. 57, 74). He expressed confusion as to how much time elapsed from the time that he entered the jury room until a verdict was reached. While he stated that that period of time was "a very short time," he recalled that it was long enough for him to be informed of the high points of the case. (H.C. I Tr. 59–60). Yet, he later confirmed that, upon his entry into the jury room, the decision on guilt "didn't take long," and that it was not until the penalty phase of the trial that the jury went over the highlights of the case in his presence. (H.C. I Tr. 77–78).

At a second hearing held before the state habeas court on December 14, 1979, the state offered the testimony of the prosecuting attorney and the deposition of the trial court. The prosecutor recalled that when the foreperson approached the bench to explain to the court the problem with a juror, he and defense counsel were called to the bench, but neither participated in the discussion. (H.C. II Tr. 5). He recalled that the foreperson stated that one of the jurors was in a highly emotional state. (H.C. II Tr. 5). He then recalled that the foreperson momentarily returned to the jury room, and returned to the courtroom to say that the juror did not feel like continuing, and that the juror did not want to "make a big deal of the situation." (H.C. II Tr. 6). While the prosecutor stated that he did not hear any specific conversation as to how the jury was split, he did gain "the impression" that juror Greeson was in the minority, and that certain jurors were trying to get him to commit himself one way or another. (H.C. II Tr. 9). He further

testified that after the court had replaced Greeson with alternate Weinstein, the jury reached its verdict of guilty in "plus or minus five minutes." (H.C. II Tr. 12).

In his deposition, the trial judge recalled that at midnight, all the jurors had been in the jury box when they had requested fifteen more minutes to deliberate. (Duke Dep. 22). During that time, he testified that he noticed nothing unusual about any of the jurors. He recalled that the jury had been deliberating for roughly three hours at this time. (Duke Dep. 5). He was first informed that one juror was having a problem when the foreperson came into the courtroom and said one juror was in "mighty bad shape." (Duke Dep. 3). After calling the district attorney and defense counsel to the bench, he learned that the juror, Greeson, was nervous rather than physically ill. (Duke Dep. 6). At this point, Sheriff Wyatt, who was also present at the bench conference, stated that he thought that Greeson had a history of epileptic seizures, and the judge sent the sheriff to check on this. (Duke Dep. 4). After the sheriff returned, the court discharged juror Greeson without objection of either party. (Duke Dep. 4–6). He indicated that he excused Greeson to avert the risk that the juror would go into epileptic seizure, and he stated that his decision not to interrogate Greeson personally was made in light of the foreman's remark that the juror wished to avoid embarrassment. The court then ordered Weinstein, the first alternate, into the jury room to join the deliberations. After Greeson exited the jury room, the judge talked to him. The judge recalled that Greeson seemed to have been perspiring and seemed "highly nervous." (Duke Dep. 5).

The trial judge stated that he did not recall having inquired of the foreperson as to the split of the jury at the time he was first approached by the foreperson, but indicated that "if the record shows otherwise, I stand corrected." (Duke Dep. 13).

---

6. There is no evidence that Peek was in the courtroom, and if so, whether he heard the conversation at the bench.

7. The record indicates that Weinstein was designated to replace Greeson at 12:42 a.m.

He further remarked that he felt that after Weinstein joined the jury, the verdict was not returned for thirty to forty-five minutes, but he was not sure of this estimation. (Duke Dep. 9).

Based on our careful review of all the evidence, we do not find fair support for the conclusion that juror Greeson was "ill" such that he was unable to perform his duty as a juror. To the contrary, we believe the evidence shows that he was performing his duty, but not voting for a conviction when he in good conscience was unable to do so. The record demonstrates that Greeson was very nervous because of the pressure he was under, but his condition was understandable—he was the lone holdout after fifteen hours of proceedings in a murder trial. Moreover, the record does not support the conclusion that Greeson was dismissed because of his nervous condition alone, but rather shows that the trial judge, and the attorneys who agreed to dismissal, were under the misapprehension that Greeson was epileptic. There is no evidence in the record that Greeson was, or is, suffering from epilepsy.

■ We turn now to the legal consequences of the dismissal of juror Greeson and the substitution with juror Weinstein. Juror Greeson was excused and replaced by alternate juror Weinstein pursuant to Georgia statute § 15–12–172:

> 15–12–172. Replacement of incapacitated juror; effect of replacement.
>
> If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated.

A dismissal of a juror where there has been an inadequate showing of the statutory conditions would, of course, violate the statute: it may also violate the defendant's constitutional rights. An erroneous replacement of a juror can in certain circumstances deprive a defendant of his right to have his trial completed by a particular tribunal, his sixth amendment right to a fair, impartial and representative jury, and his due process rights grounded in the entitlement to procedures mandated by state law. *See Green v. Zant,* 715 F.2d 551, 555–56 (11th Cir.1983).

■ There can be no doubt that fundamental due process, and the right to a fair and impartial jury, entitles a defendant in a criminal case to be tried by the jury originally selected to determine his guilt or innocence, but subject to certain well-defined exceptions. This "valued right," implicitly recognized in *United States v. Perez,* 9 Wheat. 579, 66 L.Ed. 165, and *Wade v. Hunter,* 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949), must "in some instances be subordinated to the public's interest in fair trials designed to end in jury verdicts." *Wade v. Hunter, supra,* 336 U.S. at 689. One such instance is when a jury is hopelessly deadlocked. In that event, the judge may discharge the jury and order a new trial. *United States v. Perez, supra,* 9 Wheat. at 580.

Also, the rules in many jurisdictions, like the Georgia rule, permit replacement of a regular juror with an alternate juror, whenever the regular juror because of his physical or mental condition or for other "just" cause can no longer function. For example, Fed.R.Crim.P. 24(c) permits this procedure in federal prosecution at any time before the jury starts its deliberations. *United States v. Rodriguez,* 573 F.2d 330 (5th Cir.1978).[8] When the applicable rule

---

**8.** In *United States v. Phillips,* 664 F.2d 971 (5th Cir.1981), the court also condoned such a replacement under the federal rules even after the jury had begun to deliberate. *Contra United States v. Lamb,* 529 F.2d 1153, 1154 (9th Cir. 1975). *But see United States v. Allison,* 481 F.2d 468, 472 (5th Cir.1973), and *United States v. Hayutin,* 398 F.2d 944 (2nd Cir.1968). (The

requirement of Rule 24(c) that an alternate juror may replace a regular juror "prior to the time the jury retires but if there is no replacement the alternate juror must be discharged after the jury retires to consider its verdict" is not mandatory, contrary to the holding in *Lamb.*) *Phillips* was decided by a Unit B panel of the former Fifth Circuit and is consequently binding on the

also permits replacements after deliberations begin, the change in the jury composition does not abridge the defendant's constitutional rights if good cause is shown for the dismissal and the jury, with its new member, is instructed to begin its deliberations anew. *See United States v. Phillips*, 664 F.2d 971, 992–93 (5th Cir.1981). *But cf. People v. Ryan*, 19 N.Y.2d 100, 278 N.Y.S.2d 199, 224 N.E.2d 710 (1966) (New York constitution prohibits substitution of jurors after jury deliberations begin).

▬▬ There is another constitutional dimension in this case. Georgia law provides that no criminal defendant may be convicted by less than a unanimous jury; should the jury be unable to agree, a mistrial must be declared. *Maddox v. State*, 233 Ga. 874, 213 S.E.2d 654 (1975); W. Daniel, *Georgia Criminal Trial Practice* 629 (2d ed. 1982); A. Shulman, W. Shulman, *Georgia Practice and Procedure* (4th ed. 1975). Although a state defendant's right to a unanimous jury is not a constitutional necessity,[9] Georgia has preserved the right as a matter of state law, and may not arbitrarily deny that right to particular defendants.

> Generally the failure of a state court to comply with the provisions of state law in its criminal trials is purely a matter of local concern and is not reviewable by federal courts under the due process clause of the federal constitution. The failure of a state to afford a particular defendant the benefit of established procedures under state law may, however, result in a denial of due process when the error made by the state court renders the state proceedings so fundamentally unfair or so fundamentally deficient that they are inconsistent with the rudimentary demands of fair procedure.

*Klimas v. Mabry*, 599 F.2d 842, 848 (8th Cir.1979), *rev'd on other grounds*, 448 U.S. 444, 100 S.Ct. 2755, 65 L.Ed.2d 897 (1980)

(citations omitted); *see also Braley v. Gladden*, 403 F.2d 858 (9th Cir.1968); *cf. Gonsior v. Craven*, 449 F.2d 20, 22 (9th Cir.1971). Thus, the trial court's failure to inquire into a juror's purported incapacity before the juror is excused acquires constitutional significance insofar as failure to make such an inquiry threatens to deprive the defendant of due process. Should a trial court make inadequate inquiry and improperly remove a juror when he is not incapacitated, thereby effectively denying the defendant his entitlement under Georgia law to a mistrial if the jury is less than unanimous, the defendant's conviction may well be regarded as inconsistent with due process and the rudimentary demands of fair procedure.

Whether analyzed as a fifth, sixth, or fourteenth amendment question, a fundamental concern in a case such as this is protecting the deliberative process of the jury. A just result of a trial cannot be reached if there is an inappropriate interference with or intrusion upon the deliberative process. When considering whether to replace a juror after deliberations have begun, the failure to take adequate safeguards can produce two negative consequences. First, inadequate inquiry can result in the removal of a juror who simply cannot in good conscience vote for conviction when the other jurors all agree. Yet, a jury verdict must be in accordance with the decision of each individual juror, and each juror is entitled to be free from coercion by the judge or fellow members of the jury. Each juror is required to consult with his fellow jurors and listen to their views in arriving at what he considers to be the correct verdict. At the same time, he should not "surrender his honest conviction as to the weight or effect of the evidence

Eleventh Circuit. *Stein v. Reynolds Securities, Inc.,* 667 F.2d 33 (11th Cir.1982). *Cf. Bonner v. City of Prichard,* 661 F.2d 1206, 1209 n. 5 (11th Cir.1981). After *Phillips* was decided, however, Fed.R.Crim.P. 23(b) was amended in 1983 to provide that if a juror must be excused after deliberations have commenced, the court may

in its discretion complete the trial with the remaining eleven jurors.

9. *Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); *see also Henderson v. Lane,* 613 F.2d 175, 177–78 (7th Cir.1980).

of the opinions of his fellow jurors, or for the mere purpose of returning a verdict."[10]

Second, when substitution is necessary, the failure to instruct the jury to begin anew with their deliberations might result in a premature verdict.[11] Views of the other jurors may have become hardened before the alternate has had an opportunity to participate in the deliberations. Moreover, when the others have already agreed that the accused is guilty, the inherent coercive effect upon the alternate juror is substantial. *See United States v. Lamb,* 529 F.2d 1153, 1156 (9th Cir.1975).

■ We conclude that in this case the cumulative effect of the trial judge's failure to make a reliable determination of whether Greeson was incapacitated, his failure to ensure that Greeson understood his right to adhere to his view that Peek should be acquitted, and his failure to instruct the reconstituted jury to begin anew deprived Peek of his constitutional right to a trial by a fair and impartial jury and deprived him of his due process right to a fair trial.

The trial court failed to conduct in open court a recorded inquiry into the basis for substituting alternate Weinstein for Greeson. As the record reflects, the initial conversation between the foreman and the judge was off the record. Neither Greeson nor any of the other jurors, nor Peek, are shown to be present when the decision was made to substitute the juror. Furthermore, the jury had been participating in the trial for fifteen consecutive hours except for meals and brief recesses when the substitution was made. No inquiry was made of Greeson, however, as to whether a

night's recess would relieve his nervous tension.

The most grievous part of the process is reflected by the trial judge's comment on the record at the time: "Well, I think we ought to have the foreman to advise the, after Mr. Geeslin [sic] leaves, to advise the panel that we are not going to just, you know, start excusing at random...." This strongly suggests that the trial court thought there was nothing wrong with allowing a juror to opt out of further jury participation. The habeas testimony clearly reflects that Greeson thought the evidence failed to show that Peek was guilty beyond a reasonable doubt, that he felt the disapproving pressure of the other eleven, and that a suggestion was made that he seek to be excused. Again, we state the obvious: alternate jurors do not serve to substitute for minority jurors who cannot agree with the majority. The trial court should have made adequate inquiry in open court to determine what steps to take: an overnight recess; an *Allen*-type charge; a mistrial.

After excusing Greeson, the trial court compounded the problem by sending alternate Weinstein in without instructing the jury to recommence deliberations. Whether the jury returned in three minutes as shown by the record, or in 15–30 minutes as suggested by several trial participants at the habeas proceeding, the deliberations were flawed in the absence of instructions.

Given all the circumstances of this case, we also cannot conclude that Peek was not prejudiced by the trial court's omissions. As we have already stated, the implicit

---

10. *ABA Standards for Criminal Justice, Trial by Jury,* § 5.4. Georgia's Pattern Criminal Jury Instruction I–9 is similar and includes this sentence: "However, you should never surrender honest conviction or opinions in order to be congenial or to reach a verdict solely because of the opinions of other jurors."

11. In *Phillips, supra,* 664 F.2d at 992–93 n. 17, this court quoted the California Supreme Court's decision in *People v. Collins,* 17 Cal.3d 687, 552 P.2d 742, 131 Cal.Rptr. 782 (1976), *cert. denied,* 429 U.S. 1077, 97 S.Ct. 820, 50 L.Ed.2d 796 (1977), in which the court discussed the substitution of jurors in relation to the defend-

ant's right to a unanimous verdict under the California constitution. The California Supreme Court considered the rights to a unanimous verdict and to a verdict by twelve persons as elements of a broader right to a verdict by twelve jurors who have engaged together in deliberations. This right is violated if one juror has not had the benefit of the deliberations of the other eleven. Consequently, when substitution occurs, the jury should be instructed to begin anew with its entire process of deliberations and the alternate juror should participate fully in those deliberations.

state court finding that juror Greeson was too ill to serve as a juror is not fairly supported by the record as a whole. If juror Greeson was not incapacitated, his replacement with juror Weinstein was clearly prejudicial to the defendant. *See Rodriguez, supra,* 573 F.2d at 332. *See also Green, supra,* 715 F.2d at 556–57.[12]

Accepting the state habeas court's finding that "it had been made to appear to the Court that a juror was ill and unable to continue" does not affect our conclusion. Neither the sheriff nor the jury foreman who made it appear that juror Greeson was ill was a neutral party in the matter.[13] The need to make inquiries of juror Greeson himself should have been apparent. If the trial court had questioned juror Greeson, he would have learned that the jury was split 11–1 and that Greeson had a reasonable doubt about Peek's guilt. There is no evidence that juror Greeson was incompetent to understand the issues at the time he was excused, or that he was not discussing the case with other jurors until immediately prior to his discharge. Knowing the source of Greeson's upset condition and aware that he had been serving for over fifteen consecutive hours in a capital case, we believe that an alternative other than substitution, with no further jury instructions, was the constitutionally-mandated course. Furthermore, there is also no need to speculate as to the prejudice Peek suffered as a result of the replacement since the verdict in this case ultimately was returned within minutes after the substitution was made.

■ Finally, the district court below held that even if the trial court erred in excusing juror Greeson, the defendant waived his right to challenge the dismissal by stipulating to Greeson's removal and substitution. When the jury foreman approached the court to request that juror Greeson be excused, the judge was off the bench, in a corner of the courtroom. (Deposition of Judge Duke at 30–31; Resp. ex. # 4 v. II at 28). The conference at which counsel stipulated to Greeson's dismissal took place there in the corner, parties present including the judge, the foreman, the district attorney, defense counsel and the sheriff. (Deposition of Judge Dukes at 26–27). Peek's trial counsel testified at the state habeas hearing that he stipulated to having juror Greeson excused without informing the defendant or receiving the defendant's approval. (Resp. ex. # 4 v. I at 107–08).

In *Patton v. United States,* the Supreme Court stated that:

> the maintenance of the jury as a fact finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the express and intelligent consent of the defendant.

281 U.S. 276, 312, 50 S.Ct. 253, 263, 74 L.Ed. 854 (1930). *Patton* has since been interpreted to require that the defendant himself, and not merely defendant's counsel, approve a stipulation before it can operate as a waiver of the defendant's rights respecting the jury that tries him. *See United States v. Virginia Erection Corp.,* 335 F.2d 868 (4th Cir.1964); *cf. United States v. Baccari,* 489 F.2d 274 (10th Cir. 1973). At the very least, such a stipulation

---

**12.** Unlike *Green, supra,* we see no need to remand the case to the district court before making the prejudice determination. An important distinction between *Green* and the present case is that in *Green* the district court refused to hold an evidentiary hearing or did it apply any of the factors listed in § 2254(d) so as to obviate an evidentiary hearing. Moreover, the state habeas court made no findings relating to the historical facts (that is, what happened at the trial). Here, the state habeas court conducted an evidentiary hearing and made findings, and the district court held no evidentiary hearing because it

would appear that the petitioner had a "full, fair and adequate hearing" in the state court. 28 U.S.C. § 2254(d)(6).

**13.** Sheriff Wyatt was one of the chief investigating officers in Peek's case and had testified as a witness of the state. (Tr. 103, 174). At the state habeas hearing, the jury foreman conceded that Greeson's conduct was not his idea of jury deliberations and stated "he just wasn't cooperating at all.... He just shouldn't have been in there." (H.C. I Tr. 52–53).

must be entered into with the defendant's knowing and intelligent acquiescence. *Leser v. United States*, 358 F.2d 313 (9th Cir.1966), *petition for cert. dismissed*, 385 U.S. 802, 87 S.Ct. 10, 17 L.Ed.2d 49 (1966).

Here, however, the defendant was not among the parties present when the stipulation was agreed to; given that defense counsel never discussed the matter with him, the first time the defendant can have known anything about the stipulation to excuse Greeson is when the court went on the record as saying that the parties had so agreed. Consequently, we decline to hold that the defendant waived his right to challenge any constitutional improprieties in the dismissal of juror Greeson. For the foregoing reasons, the judgment of the district court is reversed and remanded for entry of a conditional writ.

REVERSED and REMANDED.

## APPENDIX A

### ORDER OF STATE COURT IN HABEAS CORPUS PROCEEDINGS

In these paragraphs, Petitioner claims that his convictions and sentences imposed are unconstitutional because an alternate juror was substituted for a juror without a showing of good cause and in violation of his Sixth and Fourteenth Amendment rights.

After the jury had been deliberating for approximately three hours during the guilt/innocence phase of the trial, the foreman of the jury emerged from the jury room and told the judge that one of the jurors was sick (Trial Transcript, pp. 231–232, Habeas Transcript, 4/5/79, pp. 18–29, 41, 43–45). This was not done on the record and apparently when Court was not formally in session. However, the prosecutor, defense counsel, and the sheriff were present and heard the conversation be-

tween the foreman and the judge. (Habeas Transcript, 4/5/79, pp. 92–94). The judge then announced for the record that a juror, who was misidentified as Mr. Geesling (his name was actually Mr. Greeson) was unable to continue. Both the district attorney and defense counsel agreed to excuse this juror and substitute the first alternate. (Trial Transcript, pp. 231–232, Habeas Transcript, 4/5/79, p. 94). The first alternate was sent to the jury room and a guilty verdict was returned a few minutes [1] later. (Trial Transcript, pp. 232–233). The law concerning substitution of a juror is as follows:

"If at any time … a juror … becomes ill, or upon other good cause shown to the Court is found to be unable to perform his duty … the first alternate juror shall take the place of the … juror becoming incapacitated …" *Ga. Code Ann.* § 59–910.

Petitioner waived any right to object to the substitution when his counsel agreed to the same. (Trial Transcript, p. 232). But even if this were not the case, it was not error for the trial court to substitute the first alternate where it had been made to appear to the Court that a juror was ill and unable to continue. *Tanner v. State*, 242 Ga. 437, 438 (1978). Although there is disagreement concerning the length of time the jury deliberated with the substituted member, it is presumed that the alternate was able to cast an intelligent vote in the absence of some showing to the contrary. Although the ill juror may have had a reasonable doubt concerning the guilt of Petitioner (Habeas Transcript, 4/5/79, p. 28); he was not asserting that doubt in the form of a certain vote [2] in the jury room but was, because of his physical and emotional condition, not participating in the deliberations at all. (Habeas Transcript, 4/5/79, pp. 18–20, 31–32, 39–41, 51–52). Accordingly, the replacement of juror Gree-

---

**1.** The record indicates that three minutes elapsed from the time the first alternate went into the jury room until the jury returned a verdict. The judge, district attorney, alternate, and foreman testified that approximately fifteen to thirty minutes elapsed. (Duke Deposition, p.

10, Habeas Transcript, 12/14/79, pp. 11–12, Habeas Transcript, 4/5/79, pp. 59, 69–71, 49).

**2.** This finding of fact is contrary to habeas corpus testimony of jury foreman Smith. See Appendix C, p. 689.

son with first alternate Weinstein was done for good cause. The procedure followed complied with applicable Georgia statutes and did not violate any federal constitutional rights of Petitioner.

On the matter of the amount of time the jury with alternate Weinstein deliberated before the guilty verdict was returned, the Court attaches no legal significance to the issue. There is no requirement that a jury take any particular amount of time to deliberate, and alternate Weinstein testified that he went over the evidence with the other jurors. (Habeas Transcript, 4/5/79, pp. 60, 70–71).

Therefore, the Court finds the claim for relief embodied in paragraphs 9, 10, and 11 to be without merit.

## APPENDIX B

### GREESON'S STATE HABEAS CORPUS TESTIMONY IN FULL

BY MR. McLARTY:

Q  Mr. Greeson, you do recall that you are under oath?

A  Yes, sir.

THE COURT: How do you spell your last name? Is it G-r-e-e-s-o-n?

THE WITNESS: Yes, sir.

THE COURT: Go ahead.

BY MR. McLARTY:

Q  Mr. Greeson, did you have an opportunity back in July of 1976 to serve on a Jury in Greene County?

A  Yes, sir.

Q  And was that the case of the State of Georgia versus David Peek?

A  Yes, sir.

Q  Do you recall what day that was?

A  No, sir, I couldn't say for sure, now, what day it was.

Q  All right, now. During these deliberations, did there become a reason for you to leave that Jury for some reason?

A  Yes, sir.

Q  Okay. Would you tell the Court about what happened and why you left the jury—

MR. ROBINSON: Your Honor, at this time, I'd like to enter an objection to going into any evidence concerning the deliberations in the Jury room. It is apparently an attempt to impeach the verdict of the Jury contrary to Georgia law.

THE COURT: I don't think his question is directed at what went on in the Jury room with reference to deliberations of the case but to circumstances surrounding his leaving.

MR. McLARTY: His leaving.

And if Your Honor, please, I will specifically respond to his objection by saying that Mr. Greeson was not on the Jury that either issued a verdict or a sentence in that case. And therefore, he could not be impeaching the Jury's verdict.

THE COURT: Well, that may or may not be true but I don't think we need to worry about that because I'm not interested in hearing from this witness or any other witness any conversation in the Jury room about whether or not they are going to find this man guilty. I think that would be clearly inadmissible in this proceeding.

But I will overrule the objection on the basis that I think the question to be directed at whatever procedure was followed concerning Mr. Greeson's being on the Jury and then not being on the Jury and not any deliberations with reference to the issues of the case.

Is that correct?

MR. McLARTY: That is correct.

MR. McLARTY:

Q  Go ahead, Mr. Greeson. Just describe the circumstances surrounding your leaving that Jury.

A  On what? On me leaving?

Q  Right.

A  Well, I got sick—I got so upset, I couldn't stand it anymore and it looked like I couldn't make a verdict on the—well could I go back to the defense lawyer?

THE COURT: Mr. Greeson, I would like to know a little background. For example, tell me how long the Jury had been out when you started feeling that way and I don't want to know anything about what you all were talking about because as I just indicated, that was not appropriate for this Court to go into. But I'd like to know whether you'd been out for thirty minutes or two days or whatever. Give me some time reference, so I can understand better what happened.

THE WITNESS: Your Honor, I don't know exactly but I would say three or four hours.

THE COURT: Three or four hours?

THE WITNESS: Uh-huh. (Affirmative.)

But that doesn't pinpoint it because I guess I say—

THE COURT: Do you remember the approximate time the Jury went out that day?

THE WITNESS: You mean to go in to make the decision?

THE COURT: Yes, when you were first sent out by the Judge to deliberate. Was it in the afternoon or night or what?

THE WITNESS: Yes, sir, I believe it was around eight, maybe. It's been so long I—

THE COURT: Eight p.m.?

THE WITNESS: Yes, sir.

THE COURT: Had you already been to supper?

THE WITNESS: Yes, sir. We went to supper and came back. Yes, sir.

THE COURT: So you'd been in there three or four hours when you started feeling sick?

THE WITNESS: Yes, sir.

THE COURT: All right. Now, go ahead and tell me what happened.

THE WITNESS: Well, it seemed like that I couldn't make the decision and I just kept getting more and more upset. And it was cool as well as I remember and I was actually sweating, trying to decide what to do. And I just got so upset, I—it seemed like—I had to disqualify myself.

THE COURT: Well, did you ask somebody to go out and tell the Judge you couldn't continue?

THE WITNESS: Well, yes, sir. The Foreman—I guess it is all right to say, the Foreman. The Foreman of the Jury—me and him discussed it for a few moments and he went and talked to the Judge.

THE COURT: And then he came back into the Jury room and what did he say to you?

THE WITNESS: He told me that I could be dismissed.

THE COURT: And you left?

THE WITNESS: Yes, sir.

THE COURT: And did you just leave and go home or was anything else said to you?

THE WITNESS: Well, the Judge, Mr. Duke—he met me. I remember that specifically and he shook hands with me and he said, "Chester, do you want to go to the hospital and be checked?" Because he saw I was in a jitter—that I was jumpy. And I told him, no, I said, I believe I'll be all right in a little bit.

And Mr. Reece—he was the county policeman—he asked him to escort me down to my car and make sure I was all right. So he and I talked for a few minutes outside the court room and I got to feeling better. And he said, "Now, can you go home Chester? If you can't, I'll take you."

And I said, "I'll be all right, now. I'll be all right."

THE COURT: Well, you think that whatever sickness you had was related to pressure you felt about that decision rather than any actual physical sickness you had?

THE WITNESS: Yes, sir. Yes, sir. I think so.

THE COURT: Do you have any more questions?

MR. McLARTY: Yes, sir, a few.

BY MR. McLARTY:

Q Have you ever been on a Jury before?

A I had been on the Jury but I had never served on a case—on a panel, Your Honor.

Q Okay, now. Was—did you go to the hospital?

A That night?

Q Yes.

A No, sir.

Q When you got home, did you have any other examples of sickness?

A Well, no, sir. As well as I recall, it's been so long. I don't think I went to sleep so quick. I remember I dreamed—I sat up and talked to my wife for a while and I drank something. I've forgotten whether it was coffee or milk and tried to relax and I know it was a while before I could go to sleep.

Q Now, do you recall the Court's charge to you as to your responsibility and obligations as Jurors?

A Yes, sir, I specifically remember part of it.

Q What part do you specifically remember?

A Well, the part that if there is any doubt put in your mind, you are supposed to give the Defendant the benefit of the doubt.

Q All right, sir.

A Now, I may have not stated that right but I hope I got to you what I mean.

Q Was that at least to some extent the cause of your nervousness and upset?

A Well, I think so.·

Q Now—

MR. McLARTY: Your Honor, at this stage, if I might please, I think we've made enough of a prima facie case to go back to my original assertion that Mr. Greeson would not be impeaching the verdict of that Jury since he was not there when the Jury rendered its verdict and I would like to ask some questions about the breakdown or what exactly caused that pressure, if I might.

MR. ROBINSON: Your Honor, the law is that the verdict of the Jury can't be impeached by a third person either. So if we consider Mr. Greeson a Juror, he can't impeach the verdict and he can't impeach it as a third person in the Jury room.

THE COURT: Mr. Greeson was not there when the verdict was returned. Is that not correct?

MR. McLARTY: That is correct.

MR. ROBINSON: I think it would be privileged information, Your Honor.

THE COURT: Mr. McLarty, I read your petition and I know what your allegations are and I don't know what the other witnesses are going to say but I would—I don't know.

Well, I don't guess I should comment on that. I'm going to sustain the objection to any further questions about that. Not so much because I agree with Mr. Robinson that it would be impossible for him to testify about any conversation that went on in there, but I don't really think it is necessary for you to go further with the witness. He was not there. If you need to show what happened later—what do you want him to testify about?

Do you want to ask him what the division was with reference to how many people voted guilty and how many were not? Is that what you want to ask him?

MR. McLARTY: Yes, sir.

THE COURT: What about that specific thing, Mr. Robinson?

That isn't impeaching the Jury's verdict. I do that all the time when the Jury has been out for a while.

MR. ROBINSON: Your Honor, I think the law forbids you from asking which way the verdict is but how—but what the number or the division is.

Is that what you are asking?

THE COURT: Uh-huh. (Affirmative.) I think he can ask him what the Judge in a trial can ask him and that is what is the division without telling him which way it is.

MR. ROBINSON: I think the trial judge could have asked that but I'm not sure how profitable that would be in this case. I don't know what objection I could make to it, Your Honor.

THE COURT: I will allow you to do that. To ask that one question.

BY MR. McLARTY:

Q Mr. Greeson, at the time you left the Jury room, what was the division on the— the numerical division of the Jury?

A Eleven to one.

Q Eleven to one?

Was that the cause—of your nervousness and upsetness?

A Yes. Well, it was building up.

Q Beg pardon?

A It was building up all the time, you know.

THE COURT: How long had that been the division of the Jury?

THE WITNESS: Well, it probably had been eleven to one for approximately thirty to forty five minutes. I couldn't say.

THE COURT: I think that is enough on that subject.

BY MR. McLARTY:

Q You stated that the Foreman went out and talked to the Judge, didn't you?

Did you ever talk with the Judge prior to your being excused from the Jury?

A No, sir. No, sir.

Q Did the Judge ever make any inquiries as to whether or not you were being subjected to any pressure in the Jury room?

A No, sir.

Q He made no inquiries at all of you?

A Well, now, as far as him—no, no. No, sir.

MR. ROBINSON: Will you excuse me? Just for clarification. Was the question that there were no inquiries made as to Greeson or no inquiries made at all?

MR. McLARTY: No inquiries made of Mr. Greeson.

THE WITNESS: To my knowledge, there wasn't. As far as him to me, no, sir.

THE COURT: You are not aware of any conversations the Judge may have had about that, are you?

THE WITNESS: No, sir.

BY MR. McLARTY:

Q In your discussions with the Foreman, did you ever make the statement to the Foreman you didn't want to make a big to-do about your leaving or anything like that?

A Maybe—but, sir, I can't remember. I can't say for sure but I think maybe so. Yes, sir.

Q Now, did the charge urge, to the best of your recollection, charge you regarding your responsibility once you had decided the particular issue, your responsibilities in the Jury room?

A Yes, sir. Yes, sir.

Q Do you recall what he charged you on that regard?

A Well, not all of it. No, sir. But like I told you—

THE COURT: Mr. Greeson, excuse me just a minute.

Mr. McLarty, I think the testimony you have of this witness is very clear and very straight forward and direct about the circumstances under which he left and I don't want to cut you off. There has been no objection. But I will caution you not to burden the record in this case with things that don't have anything to do with the issue. And I don't really think that what he remembers about the Judge's charge and all of that has anything at all to do with any possible procedural difficulty when he left the Jury. He said he was nervous and upset. He said that the cause of that was his inability to make a decision on the case. He said that it was divided eleven to one at the time and he said he left.

Now, I think for this Court or any court reviewing it, it should be fairly

obvious what this man's testimony about this is. And to go into a bunch of stuff about what he remembers of the Judge's charge and everything is not going to do your case any good.

But if there is no objection, I will let you go ahead with that. You've done real well with your witness and I would just rather you not burden the record so that it will become clouded.

But go ahead. I'll let you ask him anything you want to.

MR. McLARTY: Thank you, Your Honor.

BY MR. McLARTY:

Q Just one more question and then we'll let you go, Mr. Greeson.

In the last two—I guess it's almost been three years since this happened, has it not?

A It will be three in July.

Q Has what happened that night bothered you?

A Well—I can't say definitely, yes or definitely, no. I hate to put it like that—I mean and not give you a definite answer. I am a hypertension person. I get upset over certain things and certain things I don't.

Q At the time that you left that Jury, was there doubt in your mind? Was there a waivering regarding the Defendant's guilt?

A Yes, sir. There was.

MR. McLARTY: No further questions.

THE COURT: Mr. Robinson, do you have any questions of Mr. Greeson?

MR. ROBINSON: Yes, Your Honor.

### CROSS EXAMINATION

Q Mr. Greeson, did you say that was the first Jury you had served on or that you had served on another Jury prior to this?

A I had never been on a case. I had been on the Jury and Grand Jury several times but I have never served on a Traverse Jury trial.

Q I may ask two or three questions that may be redundant so I'll try to keep

this as short as I can but I want to be sure I am clear as to what your testimony is.

Did you say that during the deliberations on this case, you just got so physically ill that you did not feel you could continue?

A Yes.

Q And because of your physical condition, you discussed with the Jury Foreman the matter of your being removed from the Jury or asking the Judge to allow you to be removed?

A Yes.

Q And did you ask the Jury Foreman if he would ask the Judge that very question or did you ask the Judge yourself?

A No, sir, I didn't ask him. The Foreman asked him because there was a lot of us—in other words, kind of green on that because we—lot of us never had been on a case before and we thought the Foreman was supposed to do everything. We didn't know. I didn't know.

Q You said you had a history of hypertension?

A Yes, sir. In the last few years.

Q Meaning how long when you say the last few years?

A Well, it probably started some four years ago.

Q Before the Jury trial?

A Well, yes, sir but it wasn't bad. I wasn't under medication and probably six months after this, I had to go on medication and continue to take it for high blood pressure.

Q Mr. Greeson, at the time that you asked to be removed from the Jury, did you feel that you would have difficulty making a decision? Did your physical condition really bother you?

Q Yes, sir, and I think—I knew I was going to have difficulty in making a decision but I think it was more the decision— in other words, the way the other eleven had decided to go and I didn't think I was—it was a combination. I was upset.

I didn't think I could and I was—I couldn't even think any more and I—

THE COURT: Mr. Greeson?

THE WITNESS: Sir?

THE COURT: Is it what you're saying and I don't want to put words in your mouth at all, but it is very important that I understand exactly what happened.

THE WITNESS: Yes, sir.

THE COURT: Is what you're saying that you were not going to be willing— that you were afraid you weren't going to be willing to go along with the other eleven that that upset you so much that it made you physically ill?

Is that what you are saying?

THE WITNESS: Well, Your Honor—I really don't know because it could have. Could I say that if you have never been upset and hypertension like I am—I can't explain it to you and you can't understand. In other words, it's just driving, driving, driving and you can't even think.

THE COURT: Well, what I'm interested in is this. We have talked about being upset. We've talked about physical illness. But now, it is important that I understand whether you got physically ill and that made it difficult for you to think and participate or whether the physical illness was caused by your being upset because you couldn't make a decision.

Now, which was it?

THE WITNESS: Well, it was the first. I got so physically—well, mental upset that I knew I couldn't make a decision.

THE COURT: What were you mentally upset about?

THE WITNESS: Well, about the case.

THE COURT: Well, that's what my question was.

I take your testimony to be that you couldn't make a decision that evening and you got so mentally upset that that made you physically ill.

THE WITNESS: Yes, that's it.

THE COURT: And so your physical illness resulted from being mentally upset because of uncertainty about the case, is that right?

THE WITNESS: Yes, sir. Yes, sir. Now, that's right. I hate for you to have to put words in my mouth but that is right.

THE COURT: Let me go at it the other way to make sure that your testimony is what I think it is. There would be two ways that you could go at this. You could be in the Jury room and be taken ill, say to feel nauseated, say you could be getting the flu or something that had nothing to do with the case. And because of that, you would feel so bad that you just couldn't think about it. That would be one kind of physical illness.

The other kind would be that you got so upset about the case and having to make that decision or maybe the uncertainty about it, that that nervousness and mental upset would make you feel sick.

Is that what happened?

THE WITNESS: Yes. That's what happened, Your Honor.

THE COURT: So any physical illness you had was caused by being that upset rather than physical illness just starting or anything?

Is that right?

THE WITNESS: Yes, sir. Yes, sir.

THE COURT: All right, Mr. Robinson.

MR. ROBINSON: No further questions.

THE COURT: You may go back outside. Thank you, sir. I assume you didn't have anything further?

MR. McLARTY: No, sir.

APPENDIX C

TESTIMONY OF JURY FOREMAN
SMITH AT STATE HABEAS
CORPUS HEARING

DIRECT EXAMINATION

BY MR. McLARTY:

Q State your name for the record, please.

A I believe it's listed Laurence Steve Smith on the courthouse records.

THE COURT: How do you spell Laurence? L-a-w or L-a-u?

THE WITNESS: U.

THE COURT: L-a-u-r-e-n-c-e?

THE WITNESS: Yes, sir.

BY MR. McLARTY:

Q Now, you recall you are still under oath?

A Yes, sir.

Q All right. Do you recall that on or about July 26th, 1976, serving on a Jury in the case of the State of Georgia versus David Peek?

A Yes, sir.

Q And what was your role on that Jury?

A I was elected Foreman.

Q And do you recall later in the evening after three or four hours of deliberation two different occasions when you went into the court and advised the Court that you had not made—that the Jury had not reached a verdict? Do you recall that?

A Two different occasions that I advised the Court? I remember one occasion that—well, I don't really remember—let's see, I remember the—

MR. ROBINSON: Your Honor, I think the record will reflect.

THE WITNESS: If you could help me, it was three years ago.

THE COURT: Let me find out exactly what you want to know. Do you want to know about Mr. Greeson's getting sick and all that? Just ask him about that. The record will reflect how many times he came out, unless you want to show that the record was not accurate or would not reflect it or something.

MR. McLARTY: That is part of what I wish to show and in addition, I wish to go into one other matter. And we can find this in Exhibit P-1 of the petition in which the Court advised the Jury that it would be very easy to go to some place for over night, to sequester the Jury. At that time, the Foreman requests a few more minutes—fifteen minutes.

And so, that seems to be the basis for the assumption the Foreman had that the Jury was about to reach a decision and I'd like to go into that.

THE COURT: Okay, ask him.

But it would be easier if you would tell him what the record reflects. Ask him if he remembers it and go from there. He can't remember what happened three years ago.

MR. McLARTY: I just didn't want to lead my witness, Your Honor, but with that instruction, I'll be glad to.

BY MR. McLARTY:

Q Do you recall those circumstances, Mr. Smith?

A Vaguely, yes, sir.

Q Okay, now. And you asked for fifteen more minutes and this was about 11:30 at night, is that correct?

THE COURT: Twelve.

THE WITNESS: If that record says so. I can't remember.

MR. McLARTY: He came back out at 12:35, Your Honor. The Jury left at 12:03 a.m.

THE COURT: Okay. All right.

BY MR. McLARTY:

Q Now, at that time, did you feel that the Jury was close to a verdict?

A Well, yes, sir. I imagine I did if I asked for fifteen more minutes. Yes, sir.

Q What did you base that assertion on?

A Well, we had—we had been talking about it continuously. It seems to me four, five or six hours. And everybody had felt that what the evidence showed indicated that the man was guilty and that everybody just—

MR. ROBINSON: Your Honor, to the extent that we are going to go into the Jury deliberations, again, here, I tender an objection.

THE COURT: All right. Let me just instruct Mr. Smith.

Mr. Smith, I don't think it is appropriate for you to be asked or to have to testify about the substance of what went on in the Jury room because that is a private matter. But I do think he can

ask you questions concerning how the Jury was divided, whether there was one or more people, two or three or however they were who might have voted differently from the rest. That sort of thing. But you aren't due anybody an explanation as to how, why anybody voted some way or anything that was said in the Jury room.

I think what he wants to know is at the time that you asked for fifteen more minutes, how was the Jury divided at that point. You don't have to say how many for guilt or how many for not guilty but how many people voted one way and how many people the other. If all twelve agreed, you would have a verdict, so you did not have a verdict.

THE WITNESS: Who was on the Jury at that time? Was Mr. Greeson and on the Jury or was Mr. Weinstein? On the Jury—

THE COURT: This was back, I think, when Mr. Greeson was still on the Jury.

MR. McLARTY: Mr. Greeson was on the Jury.

THE WITNESS: And your question is how many voted?

BY MR. McLARTY:

Q   How were the twelve people divided?

A   Well, we had—

MR. ROBINSON: Not how many for guilty or how many for innocence.

BY MR. McLARTY:

Q   I'm not asking you that. I'm just asking you the division. In other words, the number, 5–5—

A   Eleven to one. Eleven-ought-one.

THE COURT: Let's make sure that we understand the time we're talking about.

At the time that you went out and the Court inquired as to whether you would be put up for the night or whatever, you requested fifteen more minutes.

At that time, it was divided eleven to one. Is that your testimony?

THE WITNESS: Well—not with almost three years delay, it is hard for me to remember, putting it in that time because it is just a blur.

We had a division. At times, instead of eleven to one, it was eleven to four—eleven and then it worked—it kept working down. So I really don't know at that precise minute. You know, I just had the feeling and the Judge—well, I just had the feeling that given time—

THE COURT: Given a few minutes that you might?

THE WITNESS: Resolve the thing. Not knowing what would happen if we were locked up at night and brought back the next morning. So, to me, not having served as Foreman before, in my judgment, with things progressing like they were, it was the best thing to do. Just to try to wait it out.

THE COURT: And your testimony is that you don't have any clear, definite recollections?

THE WITNESS: That's right.

THE COURT: Exactly how it was divided up?

THE WITNESS: I absolutely do not.

THE COURT: Go ahead.

BY MR. McLARTY:

Q   Now, do you recall if at the time that you went out there and asked the Court for fifteen more minutes, whether or not Mr. Greeson was ill at that time?

A   I could not say whether it was my opinion at that time that Mr. Greeson—and that's—whether he was sick at that time and ought to be excused or whether or not. At that time, I couldn't say—I mean, from memory. I mean, I would just be taking a guess. Now, I can give you a guess but I can't factually.

Q   I think the record may help you out, Mr. Smith. When you asked for the fifteen more minutes and went back into the Jury room, that was precisely thirty two minutes before you came out and indicated to the Court that Mr. Greeson was ill.

A   Okay. It was thirty minutes prior to that trip out there? Okay. I would say then that yes, I thought that—at that time

that—well, whether he would be or not. I don't know.

At the time I came out, I thought he was sick and ought to be excused and he agreed and everybody else in there agreed, it would be all right if he left. Thirty minutes before—whether he was sick thirty minutes before—I imagine he was but it wasn't severe enough to where we thought he ought to be excused. I mean, we were still trying to—

THE COURT: Trying to what?

THE WITNESS: Trying to work out, you know, work the vote on down to where we could be unanimous and—

THE COURT: Reach a verdict?

THE WITNESS: Reach a verdict and go home.

BY MR. McLARTY:

Q   Now, without telling which side was voting for which side or anything like that—

A   What do you mean by side?

Q   Acquittal or conviction.

A   Okay.

Q   Now, I don't want to go into that, at all.

But were both sides being very strong in their position, in arguing their positions during their deliberations?

THE COURT: I don't think that is an appropriate question. I think it invades the privacy of the Juror to ask a question like that. I've allowed you to ask him how it was divided. This witness has testified it was eleven to one and that's in the record. I don't think he ought to be put in the position of having to describe to you what went on in the Jury room. Except as it relates to Mr. Greeson's leaving.

BY MR. McLARTY:

Q   Now, did you and Mr. Greeson have any conversation regarding his illness?

A   Any conversation regarding his illness?

Q   Correct.

A   Yeah, I asked him, you know, how he was feeling. I can remember doing that. I mean, the man kept going to the bathroom and he was turning a dark shade of red and sweat—I mean, his shirt was saturated with sweat. I mean, the man looked sick to me. And I imagine anybody that saw him at that time, you know. He kept doing his head like that. (Indicating.) And staying in the bathroom, for—I didn't time it but he went to the bathroom several times and he stayed in there for minutes at the time.

I mean, the man just gave me the opinion that he was sick.

Q   He gave you the opinion. Did he tell you he was sick?

A   He indicated before I came out to the Judge that he was sick and that if there was anyway, he would like to go home and that he was just ill.

Q   Now, when he asked you that, did you inquire as to whether or not maybe a good night's sleep would make him feel better in the morning?

A   No. No.

Q   You didn't make that inquiry at all?

A   No, I didn't ask him that.

Q   So, for all you know, it might have been a temporary problem?

A   Yes, for all I know, if could have been.

Q   Who made the suggestion that he be excused from the Jury? Was that his suggestion or was that your suggestion or another Juror's or was it a group suggestion?

A   I imagine it was just a consensus. We did everything in consensus. I mean, you know, I have never been a Foreman before. I didn't know how to run it. I let everybody have their say.

THE COURT: You mean it was a general feeling among the Jurors that it would be a good idea if Mr. Greeson were just excused?

THE WITNESS: Yeah. Yeah. Exactly.

THE COURT: So then you went out and asked the Judge about it?

THE WITNESS: Yes. To find out if it was possible. I didn't know if it was a possibility or not.

THE COURT: I think the record will reflect what happened when he got out in the court room but you are asking him—

MR. McLARTY: I would like to make some inquiries on that.

BY MR. McLARTY:

Q When you went out to the court room, did the rest of the Jury stay back in the deliberation room?

A Yes, sir. They did.

Q All right. Could you describe the conversation that occurred with the Court at that time?

A Yeah. I went out and told the Judge we had a Juror that was sick and he wanted to be excused. And he called the two attorneys up and he asked each one of them, he said, we've got a Juror that is sick and would it be possible, you know, do they have any objections as to the Juror being relieved. And both of them said, fine.

Q Did the Judge inquire as to what type of sickness or what the cause of the sickness was or whether or not the Juror was just tired?

Did he make any inquiries of you, at all, of that nature?

A I think he, more of less, just took my word that the man was sick and it was not a temporary thing. And that he wanted to be excused.

Q Now, was what you indicated to the Court that Mr. Greeson was sick or that Mr. Greeson was nervous and upset?

A I indicated to him that he was sick.

THE COURT: Let me read this to Mr. Smith to refresh his recollection.

Mr. Smith, the transcript of the trial indicates the following: "The Foreman of the Jury asked the Court a question at 12:35 a.m.

THE COURT: All right. Let the record show that the Foreman has come out and indicated that Mr.—"

THE COURT: This says Gheesling but it means Mr. Greeson.

"He feels that he is extremely nervous and almost at the breaking point and that they have been trying to do what they could to placate him and to keep something from happening that Mr. Gheesling —"

THE COURT: Meaning Mr. Greeson.

"Has requested that he would like to be excused. And, Mr. Briley, I believe you said you will stipulate."

THE COURT: Now, that's what the Judge indicated that you had said at the time. And does that square with what you remember?

THE WITNESS: Yeah. Yeah, that does.

THE COURT: That you reported to the Judge that Mr. Greeson was extremely nervous and almost to the breaking point and wanted to be excused.

THE WITNESS: Yeah. I would say that was—yeah.

BY MR. McLARTY:

Q So, as opposed to your advising the Court that Mr. Gheesling or Mr. Greeson or which ever one it was, was sick, it was in fact that he was nervous and upset and almost at a breaking point?

A Yeah. Yeah. If that's what the record says—I mean, it's been since '76 and I can't remember. All I knew is the man was upset and that's the way I remember it that he was sick. If I said nervous or if the record says that—

MR. ROBINSON: The record doesn't indicate on that point. The record does not indicate what Mr. Smith said and I think we have to rely on his testimony and his testimony would—has been that he told the Judge that he was sick and the record simply reflects what the Judge states.

THE COURT: Mr. Smith, do you remember—do you remember exactly what you said to the Judge at that point?

THE WITNESS: Uh-uh. (Negative.) I honestly can't remember what I told him. Whether I told him he was sick or whether I told him he was—a terribly nervous condition.

THE COURT: You don't know for sure?

THE WITNESS: I really don't.

THE COURT: Well, Judge Dukes said at that time that you said he was extremely nervous and almost to the breaking point.

You wouldn't have any quarrel, now, with that?

THE WITNESS: No, sir. I would think that that's possibly what I, you know, probably what I said. I just can't remember.

THE COURT: Do you know why? Did you have a talk with Mr. Greeson in the Jury room enough to know what the basis for his sickness was or his nervousness?

Did he tell you what was making him so upset?

THE WITNESS: If I did, I can't remember but I would—from what I've found out since then and from what I've, you know, I've talked to every Juror in there any number of times. After Mr. Greeson left, I've heard opinions. You know, I can't separate—

THE COURT: Well, I think for purposes of this hearing that we better stick with just what you remember from that time, rather than some reflection which you have made.

THE WITNESS: Well, that's the reason I'm so—you know, evasive or indecisive. I really can't—

THE COURT: I don't really think you've been evasive. It's been almost three years and I know that this has been difficult and it also is unusual that a Juror is ever called back into a court to explain what happened. Only in the most unusual circumstance would I even allow you to be questioned about this but because of the gravity of what is involved in this case and because the record reflects a fairly unusual situation with a Juror leaving and then a verdict coming in right after that, it is necessary that we go into this.

THE WITNESS: Yes, sir.

THE COURT: So, I do it somewhat apologetically but we just don't have any choice. But nobody blames you for not remembering exactly what you said three years ago. I don't remember what I did three years ago either.

*     *     *     *     *     *

## CROSS EXAMINATION
### BY MR. ROBINSON:

Q  Mr. Smith, I wish you would explain one thing for me. When you asked what the division of the Jurors were, you said the division was eleven-ought or one.

What did you mean by that?

A  Well, I guess that "ought" would be Mr. Greeson because

Q  Now, I'm not asking you who was the what, now.

A  Okay.

THE COURT: Well, now, you asked him the question. Let him answer. Go ahead and say what you want to say.

THE WITNESS: Well, maybe I'm just opening a can of worms but in his shape, it just—he didn't know what he was—he was just more or less non communicative—back and forth to the bathroom. I mean, he couldn't—he couldn't sit still. He couldn't—he just couldn't participate in what—my idea of a Jury deliberation. He just wasn't cooperative.

### BY MR. ROBINSON:

Q  I take it your testimony is that when you characterize the division of eleven-ought or one, the tie vote there was some gentleman who couldn't even give a yes or no for guilty or innocence?

Is that what you are saying?

A  Yeah.

THE COURT: So the ought or one would be Mr. Greeson, depending on how you viewed his vote.

THE WITNESS: How you viewed his—

THE COURT: He wasn't voting guilty. He just wasn't voting at all.

THE WITNESS: He just wasn't cooperative at all. He just shouldn't have been in there.

THE COURT: When you say that he was not cooperative, you mean he wouldn't cooperate and vote guilty with everybody else?

THE WITNESS: No, I don't mean that. I don't mean that. He—you know—y'all cut me off if I say too much.

Going back on my memory, Chester Greeson felt like that well—I'll have to let Greeson speak for himself.

I'll just say he wasn't cooperative. He just was out of it, more or less.

THE COURT: I guess we need not be coy with each other about whether or not it was Mr. Greeson who was not going to vote guilty. I think everybody knows that but just so the record will be perfectly clear, at that point, after you all went back in the Jury room after midnight, is it your testimony that everybody but Mr. Greeson had agreed on a verdict of guilty? And Mr. Greeson was in such a state that he just wouldn't vote either way.

Is that what you are saying?

THE WITNESS: That is more or less right. That's—I will agree with that.

THE COURT: Okay.

MR. ROBINSON: I have about two or three more questions, if Your Honor, please.

THE COURT: Okay. Every time I get this cleared up, somebody asks another question.

MR. ROBINSON: That is what I am afraid of.

BY MR. ROBINSON:

Q This only concerns your opinion at the time about Mr. Greeson when—just before you went out to ask the Judge to excuse him. Were you at that time concerned for his physical well being?

MR. McLARTY: Objection, Your Honor. He's asking for an opinion of evidence. I think he needs to qualify him

as an expert before asking for his opinion on his physical condition.

MR. ROBINSON: No, Your Honor. I am asking for an opinion as you are with any witness. And I think he is qualified to give his opinion as to whether he, himself, was concerned with the Juror's well being. I'm not asking him if he knows as a medical doctor if he was sick with pneumonia. But whether in his opinion or if he was in fact concerned with the Juror's physical health. He knows either he was concerned or he wasn't concerned for that.

THE COURT: I will allow you to ask the question.

Go ahead.

THE WITNESS: This—I thought was in the record. Yes, I definitely was concerned for Mr. Greeson.

MR. ROBINSON: No more questions, Your Honor.

THE COURT: do you have anything further?

MR. McLARTY: Yes, Your Honor.

REDIRECT EXAMINATION
BY MR. McLARTY:

Q Now, you stated that Mr. Greeson wasn't cooperative. Did he vote?

A Yes.

Q He did vote?

A Yeah, sure. From time to time, he sure did.

MR. McLARTY: No more questions. That's all I have of this witness.

VANCE, Circuit Judge, concurring in part and dissenting in part:

I respectfully dissent from the majority's opinion to the extent it reverses Petitioner's conviction. I would, however, reverse Petitioner's death sentences for reasons not addressed by my colleagues. Petitioner asserts that the trial court's instructions regarding mitigating circumstances were unconstitutionally vague. Because the instructions given in his case were virtually indistinguishable from those requiring reversal in *Westbrook v. Zant*, 704 F.2d 1487,

1503 (11th Cir.1983), and *Finney v. Zant,* 709 F.2d 643, 646–47 (11th Cir.1983), I would vacate Petitioner's death sentences and remand for resentencing.

The propriety of juror Greeson's dismissal and alternate Weinstein's subsequent substitution constitutes the principal issue in this case.[1] The majority divines constitutional error in the trial court's decision, concurred in by counsel, to dismiss a juror who was undeniably ill and who had asked to be relieved. My colleagues reach this perplexing result by way of a sequence of errors, some which have been the subject of recent Supreme Court admonitions.

The panel's first mistake lies in failing to accord the deference due to the state habeas court's findings of fact under 28 U.S.C. § 2254(d). Petitioner voices no objection to the adequacy of the factfinding procedures employed on state habeas. His arguments instead go to the ultimate facts as found. *See Sumner v. Mata,* 455 U.S. 591, 597, 102 S.Ct. 1303, 1306, 71 L.Ed.2d 480 (1982) (*Sumner II*). In *Sumner I,* the Supreme Court reiterated that under such circumstances we must give effect to the findings of the state habeas court. *Sumner v. Mata,* 449 U.S. 539, 545–47, 101 S.Ct. 764, 768, 66 L.Ed.2d 722 (1981). Of course, findings may be inferred from the factfinder's view of the facts or from clearly articulated legal principles relied on by the state court. *Green v. Zant,* 715 F.2d 551, 557 (11th Cir.1983) (*Green I*).

In sifting through the events as narrated by the state habeas court, these principal findings emerge:

(1) Greeson harbored a reasonable doubt as to Peek's guilt;

(2) Greeson's emotional and physical state, however, impaired his voting and participating in the deliberations;

(3) The foreman informed Judge Duke that a juror was ill;

(4) Judge Duke formed the correct impression that the juror was ill and unable to continue.

After acknowledging that *Sumner II* requires this court to defer to the state habeas court's findings unless they are not fairly supported by the record, the majority nevertheless embarks on its own factfinding mission and comes to the remarkable conclusion that the record does not fairly support a finding that Greeson was too ill to perform his duties as a juror. This finding is particularly remarkable in light of Greeson's own testimony at the state habeas proceeding. There, Greeson testified:

Well, I got sick—I got so upset, I couldn't stand it anymore and it looked like I couldn't make a verdict . . . .

. . . .

Well, it seemed like that I couldn't make the decision and I just kept getting more and more upset. . . . And I just got so upset, I—it seemed like—I had to disqualify myself.

. . . .

. . . I got so physically—well, mental upset that I knew I couldn't make a decision.

Greeson also responded affirmatively to the following questions:

And so your physical illness resulted from being mentally upset because of uncertainty about the case, is that right?

. . . .

Did you say that during the deliberations on this case, you just got so physically ill that you did not feel you could continue?

. . . .

And because of your physical condition, you discussed with the Jury Foreman the matter of your being removed from the

---

**1.** Petitioner raises the following additional grounds for reversing his conviction:

(a) An asserted error in the district court's failure to provide Petitioner with an evidentiary hearing to redress the fact that transcripts of the state court proceedings had never been reviewed by a habeas court;

(b) An alleged denial of Petitioner's constitutional right to a fair trial arising from the fact that one of the jurors was allowed to go home for lunch without Petitioner's consent;

(c) An allegedly unconstitutional exclusion of minorities from the grand and petit juries. All three contentions lack merit.

Jury or asking the judge to allow you to be removed?

. . . .

Mr. Greeson, at the time that you asked to be removed from the Jury, did you feel that you would have difficulty making a decision? Did your physical condition really bother you?

The majority's finding is even more remarkable when jury foreman Smith's testimony is also considered. He testified as follows:

... I thought he [Greeson] was sick and ought to be excused and he agreed and everybody else in there agreed, it would be all right if he left.

. . . .

Yeah, I asked him, you know, how he was feeling. I can remember doing that. I mean, the man kept going to the bathroom and he was turning a dark shade of red and sweat—I mean, his shirt was saturated with sweat. I mean, the man looked sick to me. And I imagine anybody that saw him at that time, you know.

. . . .

I mean, the man just gave me the opinion that he was sick.

. . . .

He indicated before I came out to the Judge that he was sick and that if there was anyway, he would like to go home and that he was just ill.

The majority has been able to determine, by looking at a cold record eight years after the fact, that juror Greeson was not as sick as he or foreman Smith thought and that he could have continued to perform his duties as a juror.[2] In my view this is precisely the type factfinding that *Sumner I* and *Sumner II* prohibit.[3]

2. According to the majority, Greeson at state habeas indicated that his sickness was due not to physical illness but rather to emotional distress brought on by the numerical division of the jury which had shifted to eleven to one in favor of guilt, Greeson being the lone holdout. This distinction is irrelevant. Petitioner has never accused foreman Smith of lying about Greeson's incapacity. Nor has Petitioner intimated that the other jurors bullied Greeson into a state of emotional and physical collapse. In lieu of fraud or duress, I am unable to conclude as a matter of constitutional right that a mistrial must issue whenever a juror, in agonizing over a verdict, lapses into incapacity. *See United States v. Armstrong,* 654 F.2d 1328, 1333 (9th Cir.1981), *cert. denied,* 454 U.S. 1157, 102 S.Ct. 1032, 71 L.Ed.2d 315 (1982). *Cf. Green v. Zant,* 738 F.2d 1529, 1531–33 (11th Cir.1984) (*Green II* ) (dismissal of a juror who was so ill that she could not continue deliberations not of constitutional significance). Nor does the Constitution require us to reverse a trial judge who incorrectly evaluates an impaired juror's prospects for rapid recovery.

3. In addition, the majority's indictment of Judge Duke's inquiry is replete with factual inaccuracies and judicial overreaching. My colleagues incorrectly state that "Greeson testified he had no physical ailments at the time of the trial but since that time had been diagnosed as having mild hypertension." In fact, Greeson testified to the contrary. He recounted that he already suffered from mild hypertension at the time of trial, a condition which began to require medication six months later.

The opinion fails to note that no one—neither Petitioner nor Respondent—ever queried Greeson at the state habeas hearing whether he suffered from epilepsy or any malady other than hypertension when he served on the jury. Petitioner, of course, bore the burden of ruling out the possibility of epilepsy on habeas review. *Bentley v. Willis,* 247 Ga. 461, 276 S.E.2d 639, 641 (1981).

The opinion goes on to discredit the trial court's investigation by finding that "no one knew which juror [Greeson or Geesling] was being excused." It is clear after *Pullman-Standard v. Swint,* 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), however, that it is the sole province of the habeas trial court, not the appellate court, to resolve disputed facts. *Id.* at 291–92, 102 S.Ct. at 1791. That admonition extends to the questions whether Greeson had epilepsy and whether the sheriff understood that it was Greeson who was in distress. Were such facts determinative, the proper course would be remand. Under the precepts of *Green I,* however, no remand is necessary because voir dire would have revealed that Greeson was on the verge of breakdown.

Since the trial court had cause to excuse Greeson, it was free to dismiss him over counsel's objection. *See United States v. Dominguez,* 615 F.2d 1093, 1095–96 (5th Cir.1980). In this case, of course, defense counsel expressly stipulated to the substitution.

The majority discerns a "grievous" disregard for Petitioner's rights in the trial judge's comment that "we are not going to ... start excusing at random." This inference is wholly unwarranted. The comment, coming as it did

The majority acknowledges that a defendant's constitutional right to have his trial completed by a particular jury must yield in the event it becomes necessary to replace an ill juror with an alternate. Only last year, in *Green I*, we held that constitutional error would not inhere in a trial court's failure to investigate the proffered reason for dismissal if the juror "was [ ] incapacitated and if a hearing would have revealed that fact to the trial court...." A defendant would not be "prejudiced by the [trial] court's failure to hold a hearing" to the extent a subsequent hearing substantiated cause. 715 F.2d at 557.

In this case, juror Greeson was unquestionably ill, too ill to debate or vote. At the state habeas hearing, he freely stated that he had been ill and had asked to be relieved. Because no prejudice therefore emanated from the decision to dismiss Greeson, Petitioner's claim must fail. *See Green II*, 738 F.2d at 1533.

The majority ignores *Green II* and goes awry in reading *Green I* to require reversal whenever the trial court conducts a lackluster investigation of cause. A rigid per se reversal rule is incompatible with the prejudice standard formulated in *Green I* and applied in *Green II*.[4] The inquiry envisioned in those cases can effectively occur either at trial or subsequently, upon habeas review. *Green II*, 738 F.2d at 1533; *Green I*, 715 F.2d at 556–57. Obviously, trial courts that initiate full-fledged inquiries will avoid the potential delay, expense, and double jeopardy possibilities inherent in retrial. Obviously, a cursory investigation of a juror's claims courts reversal. An inadequate investigation *requires* reversal, however, only if Petitioner is thereby prejudiced.

By ignoring the prejudice standard, the majority's analysis flies in the face of binding circuit precedent. This alone would necessitate dissent. My strongest reservations, however, concern the underlying rationale articulated by my colleagues rather than their departure from precedent per se. In deciding to reverse, the majority takes the unprecedented step of elevating a perceived violation of Georgia state statute[5] ipso facto into error of constitutional stature. Unless strictly cabined, this unnecessary holding promises to expand the scope of federal habeas review beyond recognition.

Turning finally to the question of juror Weinstein's substitution, we must again take heed of our limited role on review. "[O]ur scope of inquiry is not the broad exercise of supervisory power that appellate courts possess in regard to federal district courts." *Green I*, 715 F.2d at 556. "Before a state prisoner may prevail, he must show that the asserted error is of constitutional magnitude." *Id.*

To date, the only circuit court that has grappled with the question has concluded that no constitutional error attends the substitution of an alternate after the jury has retired due to lack of supplementary instructions to recommence deliberations. *See United States v. Evans*, 635 F.2d 1124, 1127–28 (4th Cir.1980), *cert. denied*, 452 U.S. 943, 101 S.Ct. 3090, 69 L.Ed.2d 958 (1981). In *United States v. Phillips*, 664 F.2d 971 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982), we described the rationale of *Evans* with approval:

> In *Evans*, the trial court replaced a regular juror with an alternate after the jury had begun deliberations; however, the defendant expressed himself unequivocally in favor of proceeding with the newly constituted jury. The newly constituted jury was not specifically instructed to begin its deliberations anew, but rather was told only to continue its deliberations. Nevertheless, the appellate court concluded that the "speculative assertion of prejudice ..., to which no objection was raised, was insufficient

after the trial court had concluded its probe, instead reflects the court's refusal to dismiss a juror except for good cause.

**4.** The majority asserts that "there is also no need to speculate as to the prejudice Peek suffered as a result of the replacement since the verdict in this case ultimately was returned within minutes after the substitution was made," however, they cite no authority for this novel proposition. *Compare Green II*, 738 F.2d at 1533 (finding no prejudice resulted from dismissing and replacing an ill juror who was in

the minority opposing imposition of the death penalty even though the jury ultimately sentenced the defendant to death).

**5.** This determination is reached by importing the requirements of Fed.R.Crim.P. 24(c), or rather its supposed requirements, into the provisions of Ga.Code Ann. § 15–12–172. Significantly, none of the Georgia courts that have reviewed Petitioner's claim has discerned a violation of that passage.

to justify reversal," stating that "[n]othing *precluded* the jury from starting from the very beginning all over again." 635 F.2d at 1128 (emphasis added). 664 F.2d at 992 n. 16. Based on *Evans* and other authority, the *Phillips* court concluded that supplementary instructions to deliberate anew would satisfy constitutional requirements. *Phillips,* however, never purported to mandate such instructions as a matter of constitutional right.

As in *Evans,* defense counsel failed to request the instruction whose omission Petitioner now deplores. Similarly, nothing in the original proceedings hindered the jury from beginning deliberations all over again. The state habeas court found that the jury reviewed the case for juror Weinstein's benefit after he joined the jury. Weinstein had listened to the entire trial and was present for the charge to the original jury. Since the prejudice that Petitioner alleges, *see Green I,* 715 F.2d at 557, is speculative at best, I am unable to conclude that the circumstances surrounding alternate Weinstein's substitution were fundamentally unfair in derogation of Petitioner's constitutional rights.

## ON PETITION FOR REHEARING EN BANC

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

BY THE COURT:

A member of this court in active service having requested a poll on the application for rehearing en banc and a majority of the judges in this court in active service having voted in favor of granting a rehearing en banc,

IT IS ORDERED that the cause shall be reheard by this court en banc *with* oral argument on a date hereafter to be fixed. The previous panel's opinion is hereby VACATED.

The clerk will specify a briefing schedule for the filing of en banc briefs.