Donald Alan **MILLER**,
Petitioner-Appellant,

v.

**A.A. STAGNER and R.L. Pulley,**
Respondents-Appellees.

Leroy **FREEMAN**, Petitioner-Appellant,

v.

**A.A. STAGNER and R.L. Pulley,**
Respondents-Appellees.

Nos. 84–5980, 84–5981.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 9, 1985.
Decided April 8, 1985.

Donald Alan Miller, San Luis Obispo, Cal., Keith C. Monroe, Roger S. Hanson, Santa Ana, Cal., for petitioners-appellants.

Donald F. Roeschke, Los Angeles, Cal., for respondents-appellees.

Before SNEED, POOLE and FERGUSON, Circuit Judges.

POOLE, Circuit Judge:

Appellants Miller and Freeman were convicted of conspiracy to commit murder in violation of California Penal Code §§ 182 and 187. They appeal the district court's dismissal of their petitions for writs of habeas corpus under 28 U.S.C. § 2254.

**FACTS**

The district court reviewed the state record from which the following facts appeared: Appellant Miller, a physician, was principal owner of a corporation which ran two medical clinics. Appellant Freeman was employed by Miller as a janitor at both clinics. In October, 1978, one of the clinics was destroyed by fire. Fire investigators determined that the fire was arson-related. White, a long time friend of Freeman, contacted Woods of the Indio police department and claimed to have information regarding the fire. At the request of police and an insurance company White met with Freeman on several occasions to elicit details concerning the fire.

When White met with Freeman on December 20, Freeman asked White if he would be willing to kill someone and White responded in the affirmative. Freeman asked White what it would be worth to him; White said $5000. After Freeman made a phone call, the two men proceeded to Miller's office at the unburned clinic where they met Miller.

Miller asked White if he would be willing to kill Miller's wife, from whom he was separated, for $5000. Miller and White agreed during this conversation on the time, place and manner of the planned killing. Miller then told White to meet him at a bank in Beverly Hills on December 22 to receive half the money, the other half to be paid after the killing.

White failed to meet Miller as arranged, but instead met Freeman and told him he did not have the silencer for his gun that Miller had requested. The two men drove to Miller's office. Miller stated that he had waited for White for two and a half hours and wanted to know why White had not met him.

Miller stated that he wanted his wife killed no later than Sunday, December 24. White stated that he could not do it that quickly because he needed a silencer. Miller gave White $3000 in one hundred dollar bills. After he spoke briefly on the telephone, Miller stated the murder could not occur that weekend and took back the $3000.

On December 27, White and Freeman met at the Indio Hotel and drove to the clinic where they met Miller. There was further discussion between Miller and White about murdering Miller's wife.

They discussed the silencer and a date for the killing. White said he would try to obtain a silencer and Miller told him to contact Freeman when he obtained one.

Freeman and White returned to the Hotel Indio bar where they met Russell, an undercover investigator for the Riverside District Attorney's office. White stated he did not want to do the killing and suggested that Russell do it. Freeman asked Russell if he wanted to kill Mrs. Miller and Russell replied he was interested in making $5000. Russell stated he would need a photograph of Mrs. Miller and information about her vehicle and her residence. Freeman supplied the necessary information and $4000 in cash on January 2. He told him he would have the other $1000 the next day. Russell said he wanted more money and Freeman agreed to check it out.

Russell and Freeman met the following day and Freeman gave Russell an additional $1000 and drew for him a diagram of Mrs. Miller's house. He told Russell that Miller stated he might be able to come up with an additional $2000 in six months. When Russell suggested he talk to Miller, Freeman refused.

On January 4, Russell saw Miller at Alphy's Restaurant. He identified himself, told Miller that they had a mutual friend named Freeman, and said that he was the one who was going to handle it. Miller asked how he got involved; Russell responded that he decided to do it when White said he could not. Russell asked Miller for more money. Miller stated he might be able to pay more money in about six months. When Miller indicated he did not want to talk anymore, he was arrested by surveilling officers.

## ANALYSIS

■ "State prisoners are entitled to relief on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution." *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770

(1963); *Bashor v. Risley*, 730 F.2d 1228, 1232 (9th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984).

Appellants challenge their convictions as unconstitutional on numerous grounds. We consider each contention and its pertinent facts separately.

### 1. Sufficiency of the Evidence

Appellants contend that the evidence was insufficient to support their convictions because the prosecution failed to prove all the elements of the crime charged. Specifically, they contend that because neither they, White, nor Russell intended to kill Mrs. Miller, the necessary element of intent to kill was lacking, and they could not properly be convicted of conspiracy to commit murder. Instead, appellants argue, they should have been charged with conspiracy to solicit another to commit murder. The solicitation charge would carry a maximum sentence of 6 years;[1] the conspiracy charge carries a sentence of 25 years to life.[2]

■ When a petitioner in a 28 U.S.C. § 2254 habeas case challenges the sufficiency of the evidence, the issue is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

■ The evidence in this case was adequate to support the conviction under this standard. The evidence of detailed conversations between appellants, White and Russell concerning the plans for murdering Mrs. Miller clearly established appellants' intent to kill. The mere fact that neither appellant intended to do the act of killing himself is insufficient to defeat their convictions. The goal of the conspiracy was not, as appellants contend, the solicitation of murder, but the commission of the mur-

---

**1.** California Penal Code §§ 653f(b) and 187.

**2.** California Penal Code §§ 182 and 187.

der of Mrs. Miller. The evidence established the agreement between appellants to accomplish that goal and the overt acts committed in furtherance of it. *See People v. Horn,* 12 Cal.3d 290, 115 Cal.Rptr. 516, 524 P.2d 1300 (1974) (proof of conspiracy to commit a specific offense requires proof that conspirators intended to bring about the elements of the conspired offense); *see also People v. Adami,* 36 Cal.App.3d 452, 111 Cal.Rptr. 544 (1974) (specific intent to commit murder shown by solicitation).

## 2. Adequacy of Jury Instructions

### a. Lesser included offense instruction

■■■■ Appellants next argue that they were unconstitutionally convicted because the trial court did not *sua sponte* instruct the jury on the elements of conspiracy to solicit another to commit murder under the lesser included offense doctrine. Due process does not require that a lesser included offense instruction be given unless the evidence warrants such an instruction. *Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2052, 72 L.Ed.2d 367 (1982). California law is essentially the same: it requires a trial judge to instruct a jury on all lesser included offenses when the evidence raises a question as to whether all of the elements of the charged offenses were presented, but not when there is no evidence the offense was less than that charged. *People v. Sedeno,* 10 Cal.3d 703, 715, 112 Cal.Rptr. 1, 9, 518 P.2d 913 (1974), *disapproved on other grounds, People v. Flannel,* 25 Cal.3d 668, 684 n. 12, 160 Cal. Rptr. 84, 93 n. 12, 603 P.2d 1 (1980); *People v. Saldana,* 157 Cal.App.3d 443, 450, 204 Cal.Rptr. 465, 471 (1984).

■■■■ Appellants' argument fails for the same reason that their preceding argument concerning the sufficiency of the evidence fails. The evidence in this case showed that the goal of the conspiracy was the commission of the murder of Mrs. Miller, not the solicitation of the murder. Thus the evidence supported the instruction given, not the instruction appellants argue should have been given under the lesser included offense doctrine.

### b. Entrapment instruction

■■■■ Appellants challenge the trial court's denial of their requested jury instruction on entrapment. Whether they were entitled to an entrapment instruction depends upon state law. *See Hallowell v. Keve,* 555 F.2d 103, 106 (3d Cir.1977). Failure to give an instruction which might be proper as a matter of state law does not amount to a federal constitutional violation. *See Engle v. Isaac,* 456 U.S. 107, 119, 102 S.Ct. 1558, 1567, 71 L.Ed.2d 783 (1982); *Gutierrez v. Griggs,* 695 F.2d 1195, 1197 (9th Cir.1983).

■■■■ Appellants also claim that the denial of the instruction deprived them of due process of the law. Due process does not require that an instruction be given unless the evidence supports it. *See Hopper v. Evans,* 456 U.S. 605, 611, 102 S.Ct. 2049, 2052, 72 L.Ed.2d 367 (1982). The test of entrapment under California law is whether the conduct of the law enforcement agent was likely to induce a normally law-abiding person to commit the offense. *People v. Barraza,* 23 Cal.3d 675, 689–90, 153 Cal.Rptr. 459, 467, 591 P.2d 947 (1979). In this case there is no evidence of inducement by law enforcement agents upon which an instruction could be based. On the contrary, the evidence shows that the criminal activity was conceived and executed by appellants, and that they solicited an informant and an undercover police officer to aid them in their plan. Thus appellants' due process argument also fails.

## 3. Specific and General Statutes

■■■■ Appellants claim that a specific California statute, California Penal Code § 653f(b) (solicitation), governs their alleged criminal activity, and preempts application of the general statutes, California Penal Code §§ 182 (conspiracy) and 187 (murder). Although cast as a federal constitutional issue, appellants' claim rests on an asserted violation of state law. It therefore fails to allege the deprivation of a federal right necessary to entitle them to

**994**

habeas corpus relief. *See Gutierrez v. Griggs*, 695 F.2d 1195, 1197 (9th Cir.1983).

### 4. Constitutionality of the Information

Appellant Miller contends that the information on which he was charged was fatally defective because it did not set forth the requisite intent. The information accused appellants of violating California Penal Code §§ 182 and 187 in that "they did wilfully and unlawfully conspire * * * to commit the crime of murder during the period from December 20, 1978 through January 4, 1979."

■ Under the Sixth Amendment, an accused has the right "to be informed of the nature and cause of the accusation against him." The Constitution is satisfied if the information states "the elements of an offense charged with sufficient clarity to apprise a defendant of what to defend against." *Russell v. United States*, 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1046–47, 8 L.Ed.2d 240 (1962).

■ The information was not constitutionally defective. An information which tracks the applicable state statute affords defendants fair notice of the crime with which they are charged and is not required to specify the requisite mental state. *United States v. Hester*, 719 F.2d 1041, 1043 (9th Cir.1983).

### 5. Prosecutorial Misconduct.

Woods, the Indio Police Officer who had supervised White and Russell, knew that Miller had been arrested on January 4, 1979, had a preliminary hearing, and was represented by counsel. A Charles Watson told Officer Woods that he had received information that Miller still intended to kill his wife. Beginning in March, 1979, Woods used Watson as an informant to determine whether Miller was still plotting to kill his wife. Watson was told not to interfere with Miller's attorney-client relationship.

Watson contacted Miller on several occasions. He told Miller that prison was a bad place, asked Miller what he knew about prosecution witnesses, offered to have Miller's case dismissed, said he could eliminate prosecution witnesses for Miller, and told Miller not to confer with his attorney. Miller's attorney did not know about these meetings. Watson's contacts with Miller were terminated when the police learned of his offer to kill prosecution witnesses.

Miller moved for dismissal of the case on the grounds of police misconduct. The prosecution argued that exclusion of any evidence obtained by reason of Watson's misconduct was the proper remedy. The trial judge denied Miller's motion and ordered the exclusion of any evidence obtained by Watson even though he did not think Watson had obtained any information of value to the prosecution.

At trial appellants themselves requested the court to admit the evidence of Miller's involvement with Watson to assist in establishing an entrapment defense. The trial court excluded the evidence under California Evidence Code § 352 which grants a court discretion to exclude evidence if its probative value is substantially outweighed by the probability that its admission will necessitate undue consumption of time, create substantial danger of undue prejudice, confuse the issues, or mislead the jury. Appellant Miller now argues that exclusion of the evidence violated his rights to due process and trial by jury.

■ In a habeas proceeding, determining whether the exclusion of evidence in the trial court violated petitioner's due process rights involves a balancing test. In weighing the importance of evidence offered by a defendant against the state's interest in exclusion, the court should consider the probative value of the evidence on the central issue; its reliability; whether it is capable of evaluation by the trier of fact; whether it is the sole evidence on the issue or merely cumulative; and whether it constitutes a major part of the attempted defense. *Perry v. Rushen*, 713 F.2d 1447, 1452–53 (9th Cir.1983), *cert. denied*, —— U.S. ——, 105 S.Ct. 137, 83 L.Ed.2d 77 (1984). A court must also consider the purpose of the rule; its importance; how well the rule implements its purpose; and

how well the purpose applies to the case at hand. The court must give due weight to the substantial state interest in preserving orderly trials, in judicial efficiency, and in excluding unreliable or prejudicial evidence. *Id.*

■ The trial court properly applied these elements of the balancing test and held that the evidence was to be excluded. The proffered evidence was not probative of the central issue of appellants' guilt or innocence. Its connection with appellants' asserted entrapment defense was too tenuous for the evidence to be admitted because the activities complained of were completely separate from and all took place after Miller's arrest. Therefore, the evidence's slight probative value did not outweigh the state's interest in excluding evidence that would prolong the trial and confuse the issues. The court's ruling did not violate appellants' due process rights.

### 6. Discharge of Jurors

Two jurors were dismissed on the fifth day of jury deliberation. Juror Koch called in sick with the flu that morning; all counsel agreed that she be discharged and replaced with an alternate. Juror Lance informed the bailiff that Juror Johnston had been intoxicated the previous morning. The trial judge noted for the record that he had observed Mr. Johnston dropping off to sleep during rereading of testimony that day. The Court Clerk confirmed these observations.

The court held a hearing in chambers at which appellants' counsel were present but not appellants. The judge questioned Mr. Johnston, who denied having been intoxicated but admitted having fallen asleep in the jury box. Bailiff Brown, Juror Lance and Jury Foreman Overson, who were in a position to observe Mr. Johnston's demeanor, were also interviewed. Each testified that they had smelled alcohol on Mr. Johnston's breath. The judge dismissed Mr.

Johnston over the objections of both defense counsel.

In open court, the trial judge replaced the two jurors with alternates, and instructed the jury to set aside and disregard earlier deliberations and to begin deliberating anew.

Appellants complain that the dismissal and replacement of two jurors deprived them of their rights to trial by jury and due process.

■ The discharge and replacement of the jurors did not violate appellants' federal constitutional rights. The California substitution procedure followed by the trial court[3] preserved the "essential feature" of the jury required by the Sixth and Fourteenth Amendments. *Williams v. Florida,* 399 U.S. 78, 100, 90 S.Ct. 1893, 1905, 26 L.Ed.2d 446 (1970); *Henderson v. Lane,* 613 F.2d 175, 177 (7th Cir.), *cert. denied,* 446 U.S. 986, 100 S.Ct. 2971, 64 L.Ed.2d 844 (1980).

### 7. Exclusion of Appellants from the hearing.

Appellants claim that their exclusion from the in-chambers hearing violated their rights to due process, to confront witnesses against them, and to present evidence on their behalf.

■ The rights to a public trial and to due process generally include the right of defendants and their counsel to be present at all stages of trial. *Polizzi v. U.S.,* 550 F.2d 1133, 1138 (9th Cir.1976); *Bustamante v. Cardwell,* 497 F.2d 556 (9th Cir.1974) (*Bustamante II*); *Bustamante v. Eyman,* 456 F.2d 269 (9th Cir.1972) (*Bustamante I*). Violation of a defendant's right to be present does not require reversal if in the particular case the defendant's absence was harmless beyond a reasonable doubt. *Polizzi,* 550 F.2d at 1138. This is such a case. Appellants' due process rights were protected by their counsels' presence during the proceedings. Counsel fully partici-

---

3. California Penal Code §§ 1089 and 1123 permit substitution of an alternate juror when a regular juror is discharged for good cause.

pated in the hearing; they were given time to confer with their clients, to inform them of the proceedings, and to ask their clients how they wished to proceed. Exclusion of the appellants from the proceeding was harmless beyond a reasonable doubt.

■ Appellants were not denied their Sixth Amendment right "to be confronted with the witnesses against [them]" because jurors are not witnesses against the defendant. *Id.*

■ Nor were appellants' rights to due process abridged because they might have been able to testify to their observations of juror Johnston's demeanor had they been present in chambers. The trial judge heard testimony from percipient witnesses concerning juror Johnston's demeanor and behavior; the judge also had his own observations to draw upon. Opening up an inquiry into the retention or discharge of a trial juror to include the testimony of the defendants on trial obviously raises sensitive considerations, resolution of which is best left to the trial court. Appellants have not shown that the court abused its discretion under California Evidence Code § 352 in refusing their request to testify. Appellants were not deprived of due process by the exclusion of their proffered evidence under the balancing test of *Perry v. Rushen*, 713 F.2d 1447 (9th Cir.1983).

### 8. Ineffective assistance of counsel.

At the end of the fourth day of jury deliberations, appellant Miller's counsel, Mr. Scherotter, requested the court's permission to be absent from further proceedings in the case. Mr. Scherotter informed the court that he had briefed his associate, Mr. Mandanich, on the case and that Miller had consented to Mr. Mandanich's representation. The trial judge informed Miller of his right to have Mr. Scherotter present and questioned him to ascertain whether he consented to his absence. Miller responded that he understood his rights and that he waived his right to have Mr. Scherotter present.

Miller argues nonetheless that he was denied effective assistance of counsel because his counsel, Mr. Scherotter, "abandoned" him during jury deliberations. He also claims that Mr. Mandanich provided ineffective assistance of counsel.

■ To obtain relief in habeas corpus review on a claim of ineffective assistance of counsel, petitioner must show that his counsel made errors that a reasonably competent attorney acting as a diligent conscientious advocate would not have made, and he must demonstrate prejudice. *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir.1984). Miller has shown neither.

Both claims lack merit. The trial court questioned Miller about his counsel's departure and the substitution of Mr. Mandanich; Miller consented to it. Moreover, Miller failed to demonstrate that Mr. Mandanich did not act as a reasonably competent attorney or that any prejudice resulted from his conduct.

### CONCLUSION

Appellants are not entitled to federal habeas corpus relief because they have failed to show that their convictions violate the federal Constitution. The judgment of the district court dismissing their petitions for writ of habeas corpus is .

AFFIRMED.

FERGUSON, Circuit Judge, dissenting:

The majority dismisses the violation of defendant Miller's constitutional right to be present at the juror disqualification hearing as harmless error. In doing so the majority glosses over the facts material to Miller's claim. In my opinion, the Constitution simply will not countenance the practice of excluding a defendant from an in camera examination of a juror's competence after the jury has begun deliberations and has announced that it is deadlocked. Accordingly, I dissent.

After ten long weeks of trial, the jury began its deliberations. After three days of deliberations, the jury revealed to the court that it had yet to arrive at a verdict. This announcement occurred on a Thursday

afternoon and threatened to disturb the schedules of both the trial judge and defense counsel. Mr. Scherotter, defense counsel for petitioner Miller, informed his client that he had previously scheduled a vacation trip out of the country, leaving on Saturday.

When asked by counsel Scherotter for his consent to this vacation, Miller expressed reluctance to release his counsel at this critical juncture in the lengthy trial. On Friday, while the jury resumed its deliberations, Scherotter handed Miller a note stating that, in contrast to their previously negotiated fee arrangements, if Miller persisted in refusing to consent to counsel's departure, he would no longer represent the defendant after the jury returned its verdict. Faced with these terms, the defendant relented. At the end of the day on Friday, the jury again returned without a verdict. The jury foreman informed the court that the jury was hopelessly deadlocked and would "never" be able to return a verdict.

The court nonetheless ordered the jury to return in the morning and resume deliberations. This would be the first and only Saturday session during the lengthy trial. After the jury was dismissed for the day on Friday, the trial judge indicated that he wanted to finish the trial by the following Wednesday so that he could keep a scheduled appointment at a hospital. Informed of defense counsel's intention to leave the area, the court inquired whether defendant Miller consented to this procedure. Miller said that he reluctantly agreed.

On the following morning, substitute counsel for defendant Miller, Mr. Mandanich, a junior associate of Mr. Scherotter, appeared to represent Mr. Miller for the first time. Upon his arrival, Mr. Mandanich was summoned to the judge's chambers for a discussion of some unanticipated juror problems. The husband of one of the jurors, Mrs. Koch, had telephoned the court to explain that his wife was sick and could not report that day. He also stated that his wife was well enough to return to jury duty on Sunday, the following day. In addition, another juror, Mr. Lance, had reported to the bailiff that he had noticed the smell of alcohol on the breath of juror Johnston. The bailiff apparently assured juror Lance that Mr. Johnston could be removed from the jury.

Defendant Miller's substitute counsel, Mr. Mandanich, was asked to discuss the juror problems with the trial court and the prosecutor in the in camera session. The trial court apparently appreciated the difficulties that Mr. Mandanich, unfamiliar with the details of this protracted case, would have in offering an informed opinion on the matter. Accordingly, the trial court asked Mr. Mandanich what Miller's former counsel, Mr. Scherotter, would do if he had remained in the case. Mr. Mandanich responded that he did not know what Mr. Scherotter would do if confronted with these juror problems. Despite his uncertainty, Mr. Mandanich agreed to waive any claim of error if Mr. Johnston were to remain on the jury. Despite this waiver, the court decided to remove Mr. Johnston as well as Mrs. Koch from the jury. Neither the court nor Mr. Mandanich obtained the consent, waiver, or approval of Miller as to the dismissal or substitution of these two jurors.

During this in camera session, defendant Miller twice relayed a request to the trial court to permit his attendance. Both of these requests, one oral and written, were denied by the trial judge. At this in camera session, the trial court took evidence on the question of the removal of juror Johnston. The jury foreman testified that Mr. Johnston had dozed off during one day of testimony but that this had not affected Mr. Johnston's participation in the deliberations; the foreman expressed confidence in juror Johnston's ability to continue deliberations. He also stated that he had not noticed the odor of alcohol on Mr. Johnston's breath at any time. The bailiff testified that Mr. Johnston's breath did smell of alcohol and that Mr. Johnston had been belligerent toward Mr. Lance, the complaining juror.

Mr. Johnston testified on his own behalf. Mr. Johnston vigorously denied that he had been drinking alcohol during his duties but admitted to having had three drinks on Thursday evening. Mr. Johnston also explained that he had lost sleep over the case. He stated that his inability to sleep one evening was the reason for his dozing during one day of testimony in the two-month trial. Several other jurors had apparently slept through portions of the long trial.

After hearing all the evidence in camera, the trial court decided to remove Mrs. Koch and Mr. Johnston from the jury. The judge did not offer any explanation for his actions other than stating that Mr. Johnston was removed for "misconduct." Counsel for defendants Miller and Freeman entered their objections. Two alternates were sworn in and the jury was instructed to begin its deliberations anew. When the new jury retired to resume deliberations, defendant Miller asked the court why he was not permitted to attend the disqualification hearing. The judge responded that he did not think the defendant's presence would have aided the proceedings in any way.

Defendant Miller challenges the trial court's denial of his request to personally attend the inquiry into the status of the two jurors. The majority summarily dismisses his constitutional claim by noting the presence of Mr. Mandanich in the hearing and assuming that the trial court would have refused to permit Miller to testify in this in camera hearing. The majority then engages in the sheer speculation that defense counsel were permitted to consult with their clients during the course of this inquiry. Finally, the majority takes refuge in the familiar domain of harmless error. I cannot so readily dismiss the petitioner's constitutional claims and, at a minimum, I would remand to the district court for an evidentiary hearing as to whether the constitutional violation was harmless beyond a reasonable doubt. *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

The constitutional stature of a defendant's right to be present at all stages in the criminal proceedings is not subject to debate. The source of this right can be traced to the Due Process Clause of the Fifth and Fourteenth Amendments and the Confrontation Clause of the Sixth Amendment. *United States v. Gagnon*, — U.S. —, —, 105 S.Ct. 1482, 1483–84, 84 L.Ed.2d 486 (1985). Labeled a "postulate of justice" by the Supreme Court in *Snyder v. Massachusetts*, 291 U.S. 97, 115, 54 S.Ct. 330, 335, 78 L.Ed. 674 (1934), every defendant has "a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." *Faretta v. California*, 422 U.S. 806, 819 n. 15, 95 S.Ct. 2525, 2533 n. 15, 45 L.Ed.2d 562 (1975). The right to be present at "every stage of his trial" is "[o]ne of the most basic rights guaranteed by the Confrontation Clause." *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353 (1970). The Supreme Court has also "recognized that this right is protected by the Due Process Clause in some situations where the defendant is not actually confronting witnesses or evidence against him." *United States v. Gagnon*, 105 S.Ct. at 1483–84.

Although it is true that a defendant can lose this right "by consent or at times even by misconduct," *Snyder v. Massachusetts*, 291 U.S. at 106, 54 S.Ct. at 332, there has been no contention that Miller waived his right explicitly or by misconduct. Instead, the trial court rejected Miller's assertion of his constitutional right solely because it doubted the utility of the defendant's presence in the context of an inquiry into the membership of a deadlocked jury.

It is clear that the commencement of jury deliberations is a vital stage in a defendant's trial. The substitution of alternate jurors after the jury has twice informed the court that it cannot reach a verdict is a matter of critical moment to a defendant. This hardly qualifies as a "minor occurrence," *Gagnon*, 105 S.Ct. at 1483–84, in the lifespan of a criminal trial.

As we have previously stated:

[S]uch a procedure significantly limits the accused's right to a mistrial if the original jury cannot reach agreement. A lone juror who would not in good conscience vote for conviction could be under great pressure to feign illness or other incapacity so as to place the burden of decision on an alternate juror.

*United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir.1975) (en banc) (footnote omitted). It should not surprise anyone to learn that the escalating pressures exerted upon jurors to reach a verdict during a week of deliberation often result in hostility and rancor among the members of the jury. This is a price our legal system must gladly pay in exchange for the moral certainty that adheres to the jury's verdict. *Cf. In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072, 25 L.Ed.2d 368 (1970) ("It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a *proper* factfinder of his guilt with utmost certainty.") (emphasis added). "Whether analyzed as a fifth, sixth, or fourteenth amendment question, a fundamental concern in a case such as this is protecting the deliberative process of the jury. A just result of a trial cannot be reached if there is an inappropriate interference with or intrusion upon the deliberative process." *Peek v. Kemp*, 746 F.2d 672, 680 (11th Cir.1984).

A jury that has struggled to arrive at a fair and just verdict for five days should not lightly be reconstituted for reasons of judicial convenience or juror comfort. "There can be no doubt that fundamental due process, and the right to a fair and impartial jury, entitles a defendant in a criminal case to be tried by the jury originally selected to determine his guilt or innocence," subject only to a few well-defined exceptions. *Peek v. Kemp*, 746 F.2d 672, 679 (11th Cir.1984). Due process is no less offended when a court dismisses a juror after the jury announces it is deadlocked without making a reliable determination on the capacity of the current jurors to proceed. *Id.* at 681. On the record

before us, no one can determine whether the juror disqualification decision was valid or merely a means to eliminate a deadlocked jury. More importantly, however, this inquiry, vital to the integrity of the deliberative process, was conducted in the absence of the defendant.

Of course, I recognize that the defendant's presence is not required in those situations where his presence would be useless, or the benefit but a shadow. The utility of the defendant's presence, however, cannot be measured by reference to the court's or counsel's convenience. Were this the only criterion, defendants would invariably be tried in absentia. Rather, the utility of the defendant's presence stems from his right to defend his liberty throughout the factfinding process. As the Supreme Court has instructed: "Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction." *Faretta v. California*, 422 U.S. 806, 834, 95 S.Ct. 2525, 2540, 45 L.Ed.2d 562 (1975). Viewed in the abstract or considered within the specific context of the facts of this case, I cannot say that the defendant's presence during the in camera examination of a deadlocked jury would have been useless or the benefits chimerical.

Even in *Snyder v. Massachusetts*, 291 U.S. 97, 106, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934), the Supreme Court recognized that the defendant's presence would be useful during the examination of jurors. As an abstract proposition, therefore, the "defense may be made easier if the accused is permitted to be present at the examination of jurors ... for it will be in his power, if present, to give advice or suggestion or even to supersede his lawyers altogether and conduct the trial himself." *Id.* at 106, 54 S.Ct. at 332. Similarly, I have no difficulty in assuming that the defendant's presence may be of value to the defense effort whenever a court examines the membership of a deadlocked jury for possible disqualification and substitution. I can see no reason to distinguish the need for the

defendant's presence at this inquiry from the need to be present at the trial itself.

The facts of this case, however, do not require this court to make an abstract evaluation of the contours of a defendant's right to be present during an examination of a deadlocked jury. Defendant Miller, not Mr. Mandanich, was the person equipped with the personal knowledge garnered over the lengthy trial sufficient to make an informed representation by the defense regarding the demeanor of juror Johnston. Instead of asking Mr. Miller, the trial court was left to asking Mr. Mandanich what the defendant's former counsel would have done if he had been confronted with the juror qualification question. Mr. Mandanich forthrightly told the court what it should have already known: he did not know what Mr. Scherotter would do in the situation. In these circumstances, it cannot be said that the defendant's presence would have been a gratuitous addition to the proceedings.

The fundamental demands of due process will frequently prove to be an inconvenience to trial courts and to trial counsel. Our Founding Fathers rejected efficiency as the polestar for our nation's criminal justice system. Instead, "due process" is the hallmark we have inherited and must preserve for criminal trials. Due process demands that the defendant not be relegated to the role of an unnecessary bystander to a critical point in his criminal trial. In conclusion, I would remand this case to the district court for an evidentiary hearing limited to the question of whether the violation of defendant Miller's right to due process was harmless beyond a reasonable doubt. Accordingly, I dissent.